## Knowles Foundry and Machine Company, Appellee, v. The National Plate Glass Company, Appellant.

### Gen. No. 38,426.

130

Opinion filed June 28, 1939.

TAYLOR, MILLER, BUSCH & BOYDEN, of Chicago, for appellant; FRANCIS X. BUSCH, JAMES J. MAGNER, STEPHEN A. MITCHELL and CHARLES R. SPROWL, all of Chicago, of counsel.

ECKERT & PETERSON, of Chicago, for appellee; A. R. PETERSON, CHILTON P. WILSON and OWEN RALL, all of Chicago, of counsel.

MR. PRESIDING JUSTICE JOHN J. SULLIVAN delivered the opinion of the court.

This appeal by defendant, the National Plate Glass Company, seeks to reverse a judgment for $40,314.60 rendered against it in favor of plaintiff, Knowles Foundry & Machine Company, in an action brought by the latter for damages claimed to have been suffered by reason of defendant's alleged breach of contract. The verdict of the jury fixed plaintiff's damages at $59,745.40. Because of an error in computation plaintiff voluntarily remitted $1,797.60 from the amount of damages assessed by the jury and in order to avoid the court's allowance of a new trial to defendant consented to an additional remittitur of the sum of $17,632.80, thus reducing the amount of damages for which the judgment was entered to $40,314.60. Plaintiff filed a notice of cross appeal averring that the court erred in requiring it to file the remittitur reducing the judgment to $40,314.60 and praying that this

court "will reverse, vacate and set aside the said judgment of the Superior court of Cook county and enter a judgment in favor of the plaintiff for such larger amount as the Appellate court shall be of opinion is justly due the plaintiff."

This cause was before us on a prior appeal from an order of the trial court sustaining defendant's general demurrer to plaintiff's amended declaration as amended and in determining the question then presented, which was whether said declaration stated a prima facie cause of action, we were called upon to construe the contract declared upon in the light only of such surrounding facts and circumstances as were well-pleaded in the declaration, the material allegations of which were fully set forth in the opinion filed on said prior appeal. (*Knowles Foundry & Machine Co. v. National Plate Glass Co.,* 274 Ill. App. 570.)

In holding on the former appeal that plaintiff's declaration stated a cause of action, we said in *Knowles Foundry & Machine Co. v. National Plate Glass Co., supra,* at pp. 574, 583, 584:

"Plaintiff contends that, under the contract, defendant was required to take and pay for 'three large and seven small Runner Bars or approximately 10,900 pounds a day' for a period of two years.

"Defendant's theory is that the contract entered into by the parties, and set forth in the amended declaration, is a pure requirement contract, and that, inasmuch as the amended declaration and the amendment thereto fail to show that defendant did not take all of its runner [bar] requirements from plaintiff, no breach of the contract is alleged.

"The question, therefore, is squarely presented as to whether under a proper construction the contract is determined to be for requirements only or for a specific quantity of runner bars daily for two years.
"    . . .

"We are constrained to hold that plaintiff's amended declaration, with the amendment thereto, stated a good

cause of action on the contract without alleging that defendant had failed to take its 'entire requirement' of runner bars for the two years covered by the contract.''
In an additional opinion filed in that appeal denying defendant's petition for a rehearing, we said at p. 584:

''In a petition filed for rehearing in this cause it is suggested that the trial court should not be foreclosed from reaching a conclusion different from that reached by us as to the construction of the contract involved, if such conclusion is reasonably and logically justified by all of the evidence received upon the trial.

''Our conclusion is predicated upon the pleadings only, and we are not holding that, upon a trial, evidence may not be presented to show that another and different interpretation was given to the contract by the parties themselves. That question was not presented for our determination on this appeal.'

Upon remandment of the cause the trial court overruled the demurrer to the declaration as directed and defendant filed a plea of the general issue, notice of special defenses and an affidavit of merits. Defendant's affidavit of merits set forth in detail facts and circumstances surrounding and subsequent to the execution of the contract and alleged that the contract, viewed in the light of such surrounding facts and circumstances and in the further light of the interpretation placed upon it by the parties themselves, admitted of no reasonable construction other than that it covered defendant's requirements only. The affidavit of merits then averred that after defendant had sold its Ottawa plant to the Libbey-Owens-Ford Glass Company, plaintiff entered into a contract with the latter company effective as of July 1, 1931, to supply its ''requirements of runner bars'' for one year, which contract expressly canceled and superseded the ''old contract'' between plaintiff and defendant. It was further averred:

''That throughout the expressed term of the contract no one, on behalf of the plaintiff corporation, ever re-

quested the defendant corporation to take up any deficiency in runner bars; no one ever called upon or requested of the defendant corporation a decision as to whether it would ever take up the alleged deficiency, nor, during the period beginning July 21, 1929, and ending in July, 1932, did anyone representing the plaintiff corporation claim that any deficiency existed; that no tender was ever made on the part of the plaintiff of the bars making up the said alleged deficiency; that no representative of the plaintiff corporation ever applied to a representative of the defendant corporation and stated that the said plaintiff corporation was then and there ready, willing and able to fabricate the said runner bars and tender the same to the defendant corporation.

"That the defendant corporation has taken and paid for its entire requirement of runner bars from the plaintiff corporation, and defendant took no runner bars from any other source."

Defendant's theory as stated in its brief is as follows:

"(a) The proper construction of the contract sued upon is to be made by the court, in the light of all of the surrounding circumstances, aided by proof of acts of the parties thereunder. That when thus viewed the contract merely required the defendant to purchase from the plaintiff all of its requirements of runner bars, and it is admitted that the defendant did so purchase all of its requirements of runner bars from the plaintiff. It is admitted that the defendant did give all its business to the plaintiff and did not breach its contract in any particular, except in so far as the breach arises out of the differing viewpoints of construction.

"(b) A further and additional defense, *assuming* that the construction of the contract contended for by the plaintiff is the proper construction, is, that the declaration does not aver, (a) either a compliance with the conditions precedent in law on its part, to the defendant's liability, or (b) a valid excuse for such non-

compliance, and that therefore there is no cause of action stated. Nor does the evidence disclose any such compliance.

"(c) That in any event, and as of July 1, 1931, the defendant sold its Ottawa properties to Libbey-Owens-Ford Glass Company of Toledo, Ohio; that the prospect of said sale was known to the president of the plaintiff corporation, Mr. F. S. Knowles, prior to its consummation; that by another agreement between the plaintiff and Libbey-Owens-Ford Glass Company under date of July 31, 1931, by specific reference the contract of May 21, 1929, between plaintiff and defendant was canceled and was superseded by a new agreement expiring July 1, 1932.''

Plaintiff states its theory as follows:

"(a) That this Court on the first appeal properly interpreted the contract sued upon to be one for the manufacture of 3 large and 7 small runner bars per day for a period of two years; that the evidence intended to change that meaning of the contract, offered by defendant and considered by the jury, actually sustains instead of overturns that interpretation; and that such evidence is clearly not sufficient to authorize the setting aside of the jury's verdict interpreting the contract in exactly the same way as this Court had interpreted it.

"(b) That since the only defense asserted by defendant before the commencement of this litigation was that the contract was a 'pure requirements' contract, it cannot avail itself of its two afterthought 'defenses': (1) that plaintiff did not make a sufficient tender of runner bars; and (2) that plaintiff released defendant by the terms of an alleged contract with the Libbey-Owens-Ford Glass Company.

"(c) That the jury's finding that plaintiff did not by a contract with Libbey-Owens-Ford release the defendant is not against the manifest weight of the evidence.

"(d) That the jury's finding that plaintiff was excused by defendant from manufacturing and tendering runner bars to the defendant is not against the manifest weight of the evidence.

" . . .

"(f) That the verdict and judgment for $57,947.40 were well within the range of the evidence on damages, that the trial court erred in requiring a remittitur of $17,632.80 therefrom, that the plaintiff's qualified consent to a reduction of the judgment does not estop the plaintiff from taking a cross-appeal, and that this Court should reinstate the trial court's earlier judgment of $57,947.40 under the power of this Court to enter the order which should have been entered by the trial court."

Having carefully examined and considered all the evidence in the record, we think that there can be no substantial dispute concerning same with respect to the circumstances surrounding the execution of the contract by plaintiff and defendant or with respect to its practical performance by the parties. The principal disagreement between them is as to the proper construction to be given to the contract.

Therefore, for a clearer understanding of the questions presented, it is necessary to set forth somewhat fully the relevant and salient facts and circumstances shown by the evidence. For many years prior to May, 1929, the National Plate Glass Company owned and operated two glass manufacturing plants immediately adjacent to the city of Ottawa, Illinois, and in that year had in course of construction there another plant known as the new Federal Division, which is alone involved in this litigation. In the manufacture of plate glass iron "runner bars" were used in the process of grinding and polishing the rough sheets of glass. In 1925 in an endeavor to discover a more efficient method of plate glass manufacture, H. J. Eckenrode, the then president of defendant company, visited glass manufac-

turing plants in Belgium, Germany and other European countries. Defendant continued its investigation and in 1927 Eckenrode with Fred N. Spurgin, one of defendant's engineers, and some other engineers, went to Europe again to visit and inspect a Belgian plant which used a "new" process of manufacturing plate glass, including a new method of grinding and polishing. The Belgian plant not only manufactured glass but manufactured the machinery used in its glass making process and on the occasion of the 1927 visit defendant's president negotiated with the Belgian company for the purchase of machinery of the "new" design and method for use in its new Federal Division plant, which defendant then contemplated building. Late in 1927 representatives of the Belgian company came to the United States and a contract was closed with the defendant corporation for its purchase of machinery from said Belgian company for use in the new Ottawa plant. The machinery installed in the new Federal Division plant was of the same principle and design as that inspected by defendant's representatives in the Belgian plant but the new or "continuous" system had not theretofore been set up any place in the world on as large a scale as in defendant's plant. An entirely new type of "runner bars" had to be used for grinding and polishing under the new process as distinguished from those used in the method previously employed. No trial tests of the new machinery, including the runner bars, were made in the new Ottawa plant prior to the execution of the contract in question by plaintiff and defendant on May 21, 1929. The construction of defendant's new plant began in 1928, and, including the installation of machinery, furnaces and grinding equipment, was nearly completed by the middle of 1929. The plaintiff foundry company is located in the city of Ottawa and prior to 1929 it had manufactured and furnished the old style runner bars used by defendant in the operation of its Illinois and

old Federal Division plants. It continued to supply same to the Illinois plant until the spring of 1930.

Under date of March 25, 1929, plaintiff submitted to defendant the following written memorandum or bid to become the glass company's source of supply for its new runner bars for the new plant:

"National Plate Glass Company,
Ottawa, Illinois.
Gentlemen:

"We propose to furnish your entire requirement for Runners for Grinding Heads for the Federal Division in the proportion of 108 Large Runners to 80 Small Runners, for a period of Two Years based on an estimated requirement of 55 Tons per week.

"We to furnish the casting of a good grade of Gray Cast Iron machined to your blue print Drawing No. G-104, for the sum of $95.00 per net ton F. O. B. Cars your plant at Ottawa, Ill.

"The price is based on #2 Pig Iron at $20.00 per ton Chicago and is subject to revision each six months on the same basis.

"We to accept the return of scrap from the above Runners at $13.50 per ton.

"The production of these Runners in the quantities needed will require special pattern, rigging and fixture equipment which will take approximately 90 days to prepare. We are in a position to begin work on this at once.

"Our experience particularly fits us to produce these Runners and afford you a reliable source of supply.

"Trusting that we may be favored with a contract covering the above, we are,

Very truly yours,
Knowles Foundry & Machine Co.,
By F. S. Knowles
F. S. Knowles,
*President,*"

This letter, offered in evidence by defendant but excluded by the trial court on the ground that it antedated the execution of the contract sued upon, will be hereafter discussed.

The pertinent portions of the contract entered into between plaintiff and defendant May 21, 1929; are as follows:

"That: The Knowles Foundry and Machine Company shall supply to the National Plate Glass Company, at their plant in the City of Ottawa, State of Illinois, *their entire requirement of Runner Bars for the Federal Division for a period of two years beginning with the date of first delivery:* That these Runners comprise substantially elliptical plates having lugs on one side to form a grinding face and having three ears on the other side for mounting. That these Runners shall be of Grey Cast Iron. That the grinding face shall be machined to a plane surface. That the ears shall be drilled to one and three-quarter inches bore and have their outer faces machined. That these Runner Bars are of two sizes, the larger being approximately $60\frac{5}{8}''$ in the long diameter and $52\frac{7}{8}''$ in the short diameter; the smaller Runner being approximately $48\frac{1}{2}''$ in the long diameter and $41''$ in the short diameter. That *the requirements above referred to are three large and seven small Runners, or, approximately 10,900 pounds a day.*

"That the National Plate Glass Company shall pay to the Knowles Foundry & Machine Company for the above mentioned Runner Bars at the rate of Ninety-five Dollars per net ton, finished machined castings, F. O. B. cars at the plant of the National Plate Glass Company, Ottawa, Ill., in carload lots.

"That the terms of payment shall be cash on the fifteenth of the month following date of shipments.

"The above price is based on #2 Pig Iron at $20.00 per ton, Chicago, Ill., and is subject to revision each

six months on the same basis.  To-wit: if #2 Pig Iron drops to $19.00 the price of Runners shall be $94.00.

"It is further agreed that the Knowles Foundry & Machine Company shall accept the return of scrap from the above Runners at $13.50 per ton.

"It is agreed that delivery of Runners under the above agreement shall begin approximately sixty days from the date hereof." (Italics ours.)  Subsequent to the execution of the foregoing contract an unsigned purchase order dated May 21, 1929, was mailed to and received by plaintiff from defendant's Detroit office, the pertinent portions of which are as follows:

"Please enter our order No. F 951 for the following material:

"Contract dated May 21, 1929, covering entire requirements of Runner Bars for a period of two years beginning with the date of first delivery.

"Requirements referred to are three large and seven small Runners, or, approximately 10,900 pounds a day.

. . .

"CONDITIONS.

"1.  Our order number must appear on all invoices.

"2.  Acknowledge receipt of this order at once, naming shipping date."

The following letter dated May 23, 1929, accompanied the above order:

"Knowles Foundry & Machine Co.,
  Ottawa, Illinois.
Gentlemen:

"We are forwarding you herewith our order No. F-951 covering contract for our requirements of Runner Bars at the Federal Division.

"This order is issued to complete our records and we will appreciate your showing this number on all packing slips and invoices.

Yours very truly,
Paul Nesbit
*Purchasing Agent.*"

Answering this letter plaintiff replied:

"June 4, 1929.

"National Plate Glass Company,
Detroit, Michigan.

Attention Mr. Paul Nesbit.

Gentlemen:

"We wish to acknowledge, and thank you for, your letter of May 23d, in which you enclosed your order F-951 covering contract for your requirements of Runner Bars at the Federal Division.

Very truly yours,

Knowles Foundry & Machine Co.,
*President."*

To enable it to manufacture and furnish the new type of runner bars plaintiff enlarged its plant and purchased additional equipment and machinery at a cost of approximately $45,000. It is agreed that the first delivery of runner bars under the contract was made on October 21, 1929, but defendant's new Federal Division plant did not begin to operate on a substantial basis until late in 1929 or in January, 1930. Explanatory of defendant's failure to commence operations at an earlier date Frederick S. Knowles, president of plaintiff company, testified that he visited defendant's plant once or twice a week during the month of August; that 'apparently the machinery from all visual observation that I could determine, seemed to be ready to go but they were working out individual little wrinkles in order to get it started . . . they were past the time that they expected to open the plant, and they were extremely anxious to get it started;" that he did not know just what was wrong; that they were apparently very much concerned because they were not able to commence operation and that condition persisted during the months of September and October until they did start; that "the first delivery of runner bars was in October but that the plant did not really start actually

operating until January, 1930''; and that he delivered one lot of runner bars prior to that time. Plaintiff delivered the runner bars to defendant in October, 1929, on a verbal order from W. H. Wolff, superintendent of defendant's plant, and shortly after such delivery it received the following letter from the glass company's purchasing agent:

''Ottawa, Illinois, November 1, 1929.
''Knowles Foundry
Ottawa, Illinois
Gentlemen:

''Please do not ship any more runner bars to our Federal Division until further notice.

Yours truly,

The National Plate Glass Co.

By R. L. Smith.''

Knowles also testified that during the month after he received the letter of November 1, 1929, ''I had several conversations with him [Wolff] and told him we had to do something about it, that our contract called for delivery of these bars and we weren't getting delivery and wondered when he was going—what he could do, what he would do about it''; that ''I talked to him continually about it and he said, 'Well, we are going to be going here shortly. We should have been going a long time ago.' He said 'Just hold your shirt on and we will take care of things as soon as we can get going here.' You see, the plant was just being constructed and they were just starting operations, like a lot of wild men down there, all of them. —it is a huge plant, endeavoring to get it in operation''; and that in so far as he knew no other foundry in the United States made runner bars of the type specified in the contract and no other glass manufacturing plant in the country used runner bars of this type.

In a deposition taken prior to the trial, Knowles, when asked whether he talked with Wolff between No-

vember 1, and December 19, 1929, "about taking up the alleged delinquent tonnage of runner bars," said: "I do not recall that, because the only thing that they could do would be to order those bars in against the contract and pile them, which would not gain either one of us."

Spurgin, who, as heretofore stated, went to Belgium with defendant's president and others in 1927 to investigate the new process of plate glass manufacture and who was employed by the defendant when the contract between the parties was executed May 21, 1929, and before and after that time, but who later was in plaintiff's employ, testified on plaintiff's behalf on direct examination that he had "obtained data of the number of runner bars required on the Belgian machine" and that as chief engineer of defendant's new plant he computed its requirement of runner bars at "3 large and 7 small . . . per day." He testified on cross-examination that his computation was merely an estimate.

The method followed in ordering runner bars from plaintiff was that some agent or representative of the defendant would check the number of bars on hand and then either telephone or write a letter to the Knowles company requesting the delivery of a certain number of runner bars calculated to supply the needs of the defendant for approximately the next ensuing month. The record discloses that beginning with the month ending January 21, 1930, a substantial tonnage of runner bars was delivered by plaintiff to defendant each month until July 1, 1931, with the single exception of the month ending March 21, 1930. On April 18, 1930, defendant requested plaintiff to ship one car of small runner bars on May 5, 1930. On May 20, 1930, defendant requested shipment of one car of small bars and another car of "small and large bars with a ratio of five small to one large bar." On May 22, 1930, the following letter was sent to plaintiff by defendant:

"Ottawa, Illinois, May 22, 1930.
"Knowles Foundry & Machine Co.
Ottawa, Illinois
Gentlemen:

"Please cancel all orders for runner bars to our Illinois Division until further notice. You may also change instructions contained in our letter of May 20th for Federal Division to read—one car to be shipped at once—this car to contain all small runner bars, and the other car to be shipped later to contain all small runner bars, as we have plenty of the large bars on hand.

Yours truly,
The National Plate Glass Co.
By W. T. Rippey."

On June 19, 1930, defendant requested plaintiff by letter to ship "two cars of runner bars to our Federal Division . . .to be furnished to proportion of six small ones to one large one." Further letters were sent by defendant to plaintiff on July 11, 1930, July 13, 1930, September 4, 1930, September 23, 1930 and October 14, 1930, requesting the shipment of cars of runner bars in various proportions as to size and on October 15, 1930, plaintiff sent defendant the following letter:

"Ottawa, Illinois
October 15, 1930

"National Plate Glass Company,
Ottawa, Illinois.
    Attention: Mr. P. L. Barr.
Gentlemen:

"We wish to acknowledge and thank you for the shipping instructions on runner bars for the Federal Division, as contained in your letter of the 14th.

Very truly yours,
Knowles Foundry & Machine Co.
F. S. Knowles,
*President.*"

Defendant sent plaintiff further written requests on November 18, 1930, December 18, 1930, January 16, 1931, February 16, 1931, March 18, 1931, April 17, 1931, May 16, 1931, and June 10, 1931, to ship cars of runner bars of the sizes needed. Practically all these letters of defendant requesting shipments of runner bars were acknowledged by plaintiff by letters in evidence similar to that last above set forth, thanking defendant for the "shipping instructions."

H. J. Eckenrode, president of defendant company until September, 1930, and Paul Nesbit and John R. Tyson, who were in charge of the Ottawa plant after September, 1930, as well as Robert L. Smith and Wallace T. Rippey, all of whom were in one way or another identified with the ordering of runner bars, testified that at no time did any one representing plaintiff company claim that there was any deficiency under the contract and that at no time during the term of the contract was it ever made known to defendant in any manner that it was delinquent.

During the month of July, 1930, the general offices of the National Plate Glass Company were moved from Detroit, Michigan, to Ottawa, Illinois. H. J. Eckenrode, who along with Wolff had executed the contract on behalf of defendant and who had been in attendance at the Ottawa plant, was still its president at that time. He moved his home from Detroit to Ottawa in July of 1930, and continued to reside there until 1932. About September 1, 1930, Eckenrode and Wolff resigned as officers and employees of defendant. Paul Nesbit, who had made Ottawa his place of residence since the general offices of defendant were moved to that city in July, 1930, became vice president of the defendant company in charge of its office and plants at Ottawa. During the early part of September, 1930, Nesbit and John R. Tyson met with Knowles, at which time they requested that he consider the granting of a reduction in

the contract price of the runner bars. The price had theretofore in August, 1930, been reduced by plaintiff from $95 to $93 per ton in conformity with the terms of the contract, because of a drop in the price of pig iron. Knowles agreed to consider the request and within a few days advised Tyson that plaintiff would reduce the price to $85 per ton, commencing October, 1930.

Effective as of July 1, 1931, defendant sold its Ottawa plants to the Libbey-Owens-Ford Glass Company of Toledo, Ohio. Knowles testified that he had heard of the impending sale but made no inquiry of defendant with respect to its contract with plaintiff or its fulfilment of the terms thereof. He wrote the following letter to the Libbey-Owens-Ford Glass Company and received the reply immediately following:

"Ottawa, Illinois
July 7, 1931

"*Order #81451-8

"Libbey-Owens-Ford Glass Company,
Toledo, Ohio.

Gentlemen:    Attention:  Mr. S. C. Cripe.

"We are pleased to learn of your purchase of the National Plate Glass Company's plants at Ottawa, Illinois, originally the Federal Plate Glass Company; which plants it has been our privilege to serve both in the course of their construction originally many years ago, and during their operation since.

"We want you to know we are well equipped to take care of your casting requirements and value your business and friendship. We look forward to being of continued service to you and trust you will find the quality of our product and the character of our service such as to warrant the continuance of our relations.

"We greet you and trust your business conditions will warrant the continued operations of your newly acquired properties.

"The writer will welcome the privilege of meeting the personnel of your organization.

Very truly yours,
Knowles Foundry & Machine Company,.
F. S. Knowles
*President.*"

"Toledo, Ohio
July 9, 1931
*Order # 81451–8*

"Knowles Foundry & Machine Company,
Ottawa, Illinois.
Gentlemen:    Attention:  Mr. F. S. Knowles.

"We are very glad to have your letter of July 7th.

"The casting proposition for Ottawa Plant is now having consideration and you will hear from us later regarding it.

Yours very truly,
Libbey-Owens-Ford Glass Company
S. C. Cripe
General Purchasing Agent."

On or about July 16, 1931, S. C. Cripe of Toledo, Ohio, purchasing agent for Libbey-Owens-Ford Glass Company, and Clark Husted, vice president of that company, went to Ottawa, Illinois, for the purpose of superintending the operating details incident to the taking over of the plants.  Knowles met these gentlemen at the new Federal Division plant and at this conference Husted and Cripe told him that they had compiled figures showing the cost of the bars delivered at Ottawa and had determined that the $85 price for runner bars was quite excessive.  They suggested to Knowles that he go over plaintiff's books and cost figures to see if he could not modify the price and come to Toledo for another conference.  Knowles agreed to do so.  Cripe testified that Knowles went to the office of the Libbey-Owens-Ford Glass Company at Toledo, Ohio, July 22, 1931; that at that time and place "Mr.

Knowles said that he had been to a lot of expense in putting in machinery to take care of this contract. I think he said $40,000, and that the National Plate had not taken out the castings that he thought they would take, that he expected they would take. Consequently he had not made any money but that he had lost money. That he was quite anxious to retain the business and realized that in order to do so it would be necessary for him to meet competition, price, service, quality, etc." Cripe testified further: "I said that we realized Mr. Knowles had a contract to run until October of that year and I asked him if he would consider a proposition to cancel the old contract, provided I could get it accepted by our company, and we would give him a new one for our requirements of runner bars at that particular plant to run from July 1, 1931, until June 30, 1932, at $60.00 per net ton delivered." Knowles then left with the understanding that Cripe was to find out if he could get the proposition offered to Knowles accepted by the Libbey-Owens-Ford Glass Company. Within a few days plaintiff received the following letter from Cripe:

"Toledo, Ohio
July 28, 1931.

"File 622–8
"Knowles Foundry & Machine Company,
Ottawa, Illinois.
Gentlemen:

"Referring to Mr. Knowles' visit to this office on July 22nd, the proposition that was made to Mr. Knowles by the writer was referred to Mr. Husted and by him to other executives of this company for consideration, and while the price agreed upon is not quite as low as we could secure our Runner Bar Castings for from other sources, I have been authorized to write you that we will accept the proposition as outlined, providing you will agree to reduce the price of miscellaneous casting to 3½¢ per pound, delivered our plant.

"If this is agreeable to you, you may prepare and send us for our approval a formal contract covering our entire requirements of Runner Bar Castings from July 1, 1931 to and including June 30, 1932, at $60.00 per net ton, machined and finished complete, delivered to our plant at Ottawa, Illinois. Terms: 2%—10 days, Net 30 days, and you may incorporate in the same agreement, the price of 3½% per pound, delivered, our Plant, Ottawa, Illinois. Terms: 2%—10 days, Net 30 days, for such miscellaneous castings as we may order of you during the period of July 1st, 1931 to and including June 30, 1932.

"With this agreement send us a cancellation of the present contract which is dated May 21st; 1929 and send us credit memorandum covering Runner Bars and Miscellaneous Castings that you have supplied since July 1st, reducing the prices to the above figures.

"We would be pleased to receive your prompt reply.

Yours very truly,

Libbey-Owens-Ford Glass Company

S. C. Cripe

General Purchasing Agent."

Two days after the receipt of this letter Knowles telephoned Cripe and asked that the Libbey-Owens-Ford Glass Company prepare the agreement and send it to him. Libbey-Owens-Ford Glass Company prepared a contract in the following form and forwarded it to plaintiff on July 31:

"You are to furnish our Ottawa, Illinois Plant's entire requirements of runner bars from July 1st 1931 to and including June 30th, 1932, as we require and order them of you from time to time. 60.00 per net ton machined and delivered complete to our plant. In car Lots. Terms 1–10–30

"These runners comprise substantially elliptical plates having lugs on one side to form a grinding face and having ears on the other side for mounting. These runners shall be of grey cast iron. The grinding face

shall be machined to a plane surface. The ears shall be drilled, and have their outer faces machined.

"This order cancels and supersedes contract dated May 21st, 1929, between the National Plate Glass Company and the Knowles Foundry & Machine Co., for runner bars, and you are to forward us a credit memorandum for all shipments made since July 1st, 1931.

" . . .

"Reducing price from 85.00 to 60.00 delivered less 1% discount. Your written acceptance (on attached sheet #2) will constitute a contract between us.

" . . .

LIBBEY-OWENS-FORD GLASS COMPANY

Countersigned by
S. C. Cripe
—————————          By S. C. Cripe,
Buyer          Gen'l Purchasing Agent."

On August 7, 1931, plaintiff returned to Libbey-Owens-Ford Glass Company an executed copy of the contract received by him dated July 31, 1931, together with a memorandum allowing credit in accordance with the terms of such contract on the runner bars shipped to the new Federal Division plant on and after July 1, 1931.

On November 2, 1931, plaintiff sent the following letter to the Libbey-Owens-Ford Glass Company:

"Gentlemen:          Attention—Mr. C. E. Husted,
                              Vice President.

"When we entered into a contract with the National Plate Glass Company for runner bars for their Federal Division we figured on a basis of minimum tonnage for two years. As explained to you at the time you took them over this tonnage had not been taken and had netted us a loss in a considerable sum due to both the time element and tonnage.

"We entered into a new arrangement with you believing that with your continued business, even at a lower price, we could work out of our difficulties.

"With the Ottawa plant closed a great deal of the time since your acquisition it is making it increasingly hard for us. We are wondering whether an arrangement of some kind could be made whereby we could supply at least a portion of the tonnage to your operating plants.

Very truly yours,
Knowles Foundry & Machine Co.
F. S. Knowles
*President."*

In July, 1932, after the expiration of the Libbey-Owens-Ford Glass Company contract with the Knowles Foundry & Machine Company, Knowles visited Mr. Fisher, president of the defendant company at Detroit, Michigan. As to this visit Knowles testified that "I told Mr. Fisher we had entered into a contract for supplying runner bars for their plant at Ottawa; that we negotiated a contract calling for a specified tonnage over a period of two years and that they had not taken the tonnage and I wanted to see what he could do about refunding us for their default in their contract. He said he would investigate and let me know." Shortly thereafter Mr. Fisher wrote the following letter to plaintiff:

"Fisher Body Corporation
Division of General Motors Corporation
Detroit, Michigan
July 13, 1932

"Mr. Frederick S. Knowles, President,
Knowles Foundry and Machine Company,
Ottawa, Illinois.

Dear Mr. Knowles:

"Since our recent conference in my office I have had an opportunity to examine carefully the agreement of May 21, 1929, between your Company and the National

Plate Glass Company, in relation to the purchase of runner bars.

"It is my thought that you have not correctly interpreted the agreement. As it is a 'requirements' contract only, I am at a loss to understand the basis for your claim that the National Plate Glass Company is indebted to you in any sum, as I am informed that when a company ceases to operate no liability attaches to it under a 'requirements' contract.

"After a more careful examination of this agreement I am sure that you will readily appreciate that we cannot entertain your contention that the National Plate Glass Company is indebted to you for any sum.

Very truly yours,

E. F. Fisher."

At the beginning of the trial of this cause it was stipulated that each small runner bar weighed 936 pounds and each large bar 1,617 pounds; that the defendant received a total of 1,865.28 tons and paid therefor an aggregate price of $166,309.89; that plaintiff's cost of production with respect to the number of runner bars actually delivered to defendant was $57.30 a ton. Using a two-year period of 333 days a year, plaintiff computed the total tonnage called for under its construction of the contract as 3,796.86 tons and that its cost of production, if the larger quantity of runner bars it claims defendant was bound to take daily had been delivered, would have been $55 per ton.

We think the foregoing is a fair statement of the salient undisputed facts disclosed by the evidence.

We will first consider defendant's major contention that the trial court erred in not holding "as a matter of law at the close of all the evidence that the contract sued upon was a contract for defendant's requirements only and not a contract for specific tonnage and in not directing a verdict for the defendant upon this ground."

In passing upon this contention we are immediately confronted with plaintiff's insistence that the conclu-

sion reached by us on the former appeal that the contract declared upon was for a specific tonnage and not for defendant's requirements was binding upon the trial court upon remandment and is binding on this court on the instant appeal.

On the former appeal we were merely called upon to determine whether plaintiff's declaration stated a prima facie cause of action and all that we had to aid us in that determination was the contract itself and such facts and circumstances surrounding its execution as plaintiff saw fit to allege in its declaration. That the contract alleged in the declaration upon which this cause of action is predicated might reasonably be susceptible of another construction than that given to it by this court on the prior appeal was clearly recognized when we said in the additional opinion filed in that appeal (*Knowles Foundry & Machine Co. v. National Plate Glass Co., supra*), at p. 584:

"In a petition filed for rehearing in this cause it is suggested that the trial court should not be foreclosed from reaching a conclusion different from that reached by us as to the construction of the contract involved, if such conclusion is reasonably and logically justified by all of the evidence received upon the trial.

"Our conclusion is predicated upon the pleadings only, and we are not holding that, upon a trial, evidence may not be presented to show that another and different interpretation was given to the contract by the parties themselves. That question was not presented for our determination on this appeal."

We are now called upon to consider the judgment appealed from in the light of all the evidence contained in the record, including new and additional facts and circumstances, and are not limited in the scope of our review by the conclusion reached on the prior appeal. It is, of course, the law that whenever a court of review reaches and announces a conclusion of law, that court and inferior courts and the litigants are bound by the

decision. But where as in this case only the declaration was considered on the former appeal, all that was there determined was the applicability of the law to the facts disclosed by such declaration. The judgment now before us on appeal was entered, as already said, after a trial of the cause upon new and additional and supplemental facts and the former decision is not controlling. The doctrine of the law of the case is confined to a previous decision between the same parties where the same set of facts is afterward presented. (*Phez Co. v. Salem Fruit Union,* 113 Ore. 398, 233 Pac. 547.) A decision on a prior appeal is not conclusive upon a second appeal where the former decision simply remanded the case for another trial, and the judgment itself was not final between the parties and not conclusive. (*White v. Downs,* 40 Tex. 225; *Hastings v. Foxworthy,* 45 Neb. 676, 63 N. W. 955, 34 L. R. A. 321, and note K, p. 336.) Where a petition for abatement had been filed to recover back certain income and excess profit taxes assessed by and paid to the collector of internal revenue and an order dismissing said petition on demurrer was reversed on appeal, it was held that the decision on the former appeal "could have no application to other and different facts, not appearing in the petition, that might be developed on a hearing on the merits." *Aaron v. Hopkins,* 63 F. (2d) 804. The precise question before this court on the former appeal was: Did the declaration state a good cause of action? We held that it did, but we also said that we were not holding that "upon a trial, evidence may not be presented to show that another and different interpretation was given to the contract by the parties themselves."

What then, under the record now presented, was the dominant provision of the contract with respect to the quantity of runner bars defendant obligated itself to take and pay for and plaintiff obligated itself to manufacture and deliver? Was it defendant's "entire

requirement'' or was it ''three large and seven small Runners . . . a day?'' If the former, no liability may be imposed on defendant under the contract since it is conceded that it accepted delivery of all the runner bars it needed in the conduct of its business and paid for same. If the latter, a definite, specific quantity of bars was contracted for and defendant is liable to plaintiff in damages if it is shown to have breached the contract. The language employed to express the terms of the contract in this regard, being fairly and reasonably susceptible of two interpretations, it is proper and necessary to look to the evidence pertaining to the respective positions of the parties, the purpose sought to be accomplished and all of the facts and circumstances surrounding the execution of the contract, as well as to the evidence showing its practical performance by the parties themselves, to ascertain their real meaning and intention. In *McLean County Coal Co. v. City of Bloomington,* 234 Ill. 90, in discussing rules applicable to the construction of written contracts, the court said at p. 96:

''In construing a written contract the court will endeavor to place itself in the position of the contracting parties, so that it may understand the language used in the sense intended by the persons using it. (*Field v. Leiter,* 118 Ill. 17.) When the terms of a written agreement are in any respect uncertain or doubtful and the persons by their own conduct have placed a construction upon them which is reasonable, such construction will be adopted by the court, and therefore evidence of acts showing the practical construction of the instrument by the parties themselves is admissible. (*Carroll v. Drury,* 170 Ill. 571; *Burgess v. Badger,* 124 id. 288; *People v. Murphy,* 119 id. 159.''

It was contemplated that the new plant which the defendant had under construction would be completed and in operation about July or August, 1929. All the machinery and equipment for same had been purchased

in Belgium for the manufacture of plate glass by a new "continuous" process never before employed in the United States. Included in this process was a new method of grinding and polishing the rough sheets of glass, requiring a type and style of runner bar entirely different from that furnished by plaintiff to defendant in the latter's old plants employing the "old" process. While some of defendant's officers and employees had seen the "new" process in operation in Belgium, the machinery installed in the new Federal Division plant at Ottawa provided for operation on a much larger scale. Defendant had no history of experience with the new machinery and no trial tests or trial runs of such machinery were made prior to the execution of the contract. The tables in the Ottawa plant upon which the rough sheets of glass were conveyed during the grinding process were at least twice as long as those used in the Belgian plant and many more grinding heads in which the runner bars were carried above such tables were employed. The runner bars necessarily wore down in the grinding process and had to be replaced by new bars.

Spurgin, an engineer employed by defendant at the time, was one of those sent by it to Belgium in 1927 to investigate the new process. He testified in plaintiff's behalf that it was he who made the computation appearing in the contract of "three large and seven small Runner . . . a day" as the anticipated consumption of such bars by defendant's plant and that he based his computation on "actual usage" in the Belgian plant. On cross-examination he said, however, that his computation was only an estimate. Is it either likely or reasonable that defendant, without knowing the actual needs of its business as to runner bars, with newly installed and untried machinery and without any basis of experience, would contract for *exactly* three large and seven small runner bars a day for a period of two years? In our opinion the circumstances clearly indi-

cate that defendant was solely concerned with the source of supply of its runner bar needs for two years.

On the other hand what was plaintiff's position? Its plant was not adapted to the production of the new type runner bars. It expended $45,000 for the installation of the necessary machinery and equipment to manufacture them. Before doing so it would naturally inquire into the nature of its undertaking—whether or not it would be lucrative. An agreement by defendant to take its "entire requirement" of runner bars from plaintiff and a desire on plaintiff's part of an estimate as to the number or tonnage of the runner bars needed presented an entirely natural situation. Such an estimate afforded plaintiff an idea of the probable requirements it would be called upon to supply. The situation here is somewhat similar to that discussed in *Marx v. American Malting Co.*, 169 Fed. 582. A contract of sale in that case between a brewing company and a manufacturer of malt was on the seller's form, the pertinent portion of which reads: "Quantity, all their requirements to December 31, 1907." At the bottom of the form but above the signatures of the parties was written "amount of malt to be used will be between 15,000 and 20,000 bushels." The brewing company brought the action because of the seller's failure to deliver amounts needed and ordered in excess of 20,000 bushels. The evidence showed that the brewing company at the time of making the contract had erected and nearly completed extensive additions to its plant and that the market price of malt had materially advanced during the year 1907. There the court said at p. 584:

"Coming to the construction of the contract, we are of opinion that, in respect to the quantity of the malt contracted for, the *dominating specification* is found in the words, 'All their requirements to December 31, 1907,' and that the words below, 'Amount of malt to be used will be between 15,000 and 20,000 bushels,' are a *mere estimate of the probable requirement* intended by

the seller as a memorandum to be considered as advisory in the conduct of its own business, or possibly an assurance that the purchaser would want at least that quantity.

"There are several reasons for this conclusion. In the first place, it seems improbable that the vendee, evidently contemplating the enlargement of his business and then making provision for it would have limited himself while contracting for his requirements for the ensuing year to the requirements of his old business. Nor could the vendor have supposed that the old limits would be adequate to the new conditions. So far as appears there was no reason why the vendor should desire such a limitation. *The words of the sentence are themselves indefinite and seem to indicate that they were employed as rather a negligible expression than as a substantive term of the contract.* Then, again, it is a fundamental rule in the interpretation of agreements that we should ascertain *the prime object and purpose of the parties, and, in case of ambiguity produced by its minor provisions, the latter should, if possible, be so construed as not to conflict with the main purpose.* It is clear enough that these parties had in mind, not the sale of a certain number of bushels of malt, but so much as the business of the vendee would require during the period mentioned. *And the rule just stated would require that the particular language upon which the vendor relies should, if possible, be held to be the expression of an estimate merely of the probable requirements.* And we think it is easily possible to give the language that construction. In many cases a more stringent rule has been laid down, which is that, if the minor provision of the contract, is irreconcilable with the obvious general intent, it would for that reason be sacrificed altogether for the promotion of the general purpose of the agreement." (Italics ours.)

Upon the trial of this cause defendant offered in evidence the letter heretofore set forth in the nature of a

bid written by plaintiff's president to defendant under date of March 25, 1929. This letter, excluded upon plaintiff's objection, was admittedly an offer to supply runner bars to defendant on a pure requirement basis. It should be noted that when this offer was made plaintiff contemplated the expenditure necessary to adapt its foundry to the manufacture of the new runner bars. It is true that said offer or bid did not eventuate into a contract and that it was submitted nearly two months before the contract in question was executed, but it concerned the same parties and involved the same subject matter and shows clearly plaintiff's willingness at that time to contract with defendant solely on the basis of the latter's requirements with full knowledge of the expense that would be entailed in adapting its foundry to furnish same. On the authority of *Chicago Auditorium Ass'n v. Corporation of the Fine Arts Building,* 244 Ill. 532, and for the reasons stated therein, we think that this letter was admissible and that the trial court erred in excluding same. In that case the court said at pp. 538, 539:

"Complainants insists that the words 'demised premises,' which words frequently occur in the leases, mean only the portions of the lots of which it had exclusive possession and the unrestricted use. In determining this question we do not think we can be guided, alone, by the general rules and principles of law applicable to exceptions and reservations in leases. The same rules of law are applicable to the construction of leases that are applicable to the construction of other contracts, and where the language of a lease is the subject of construction, the object to be attained is to ascertain, if it can be done, the intention of the parties to the instrument and give effect to that intention. If the language is plain and unambiguous, proof *aliunde* cannot be heard to contradict or vary its meaning or give it a meaning inconsistent with the language used in the instrument. The leases here involved we think do not

belong to that class of instruments but require a construction that will give effect to the intention of the parties. To aid in the attainment of this object it was said in *Street v. Chicago Wharfing Co.,* 157 Ill. 605, at page 614: 'The court will, if necessary, put itself in the place of the parties and read the contract in the light of the circumstances surrounding them at the time it was made and of the objects which they then evidently had in view. So, also, the acts of the parties themselves, indicative of their construction placed upon it, may be resorted to for the purpose of determining the true meaning of the written agreement. And in this regard it makes no difference whether such acts are contemporaneous or subsequent.' Preliminary negotiations may be considered for the purpose of determining the meaning and intention of the parties in the use of the words employed in the instrument, but not for the purpose of varying or contradicting the plain terms of the instrument. (*Stoops v. Smith,* 100 Mass. 63; (1 Am. Rep. 85;) *Sweat v. Shumway,* 102 Mass. 365; (3 Am. 471;) 17 Am. & Eng. Ency. of Law, 23.) In our opinion the written options preceding the execution of the leases and agreement afford some light in ascertaining the understanding and meaning of the parties and are competent to be considered for that purpose.''

Assuming that plaintiff's offer or bid of March 25, 1929, was inadmissible in evidence and eliminating it entirely from consideration, our conclusion as to the proper construction of the contract would not be affected in the least.

It will be remembered that the contract here involved was executed May 21, 1929. May 23, 1929, defendant wrote plaintiff a letter giving the contract an order number to be used in connection with ''all packing slips and invoices'' issued thereunder and stated therein that the contract covered ''our requirements'' without further specification as to quantity. June 4, 1929,

plaintiff acknowledged defendant's letter of May 23, 1929, and referred to the contract as covering "your requirements," also without any further specification as to quantity. The fact that defendant inclosed with its letter to plaintiff an order form containing language practically identical with that of the contract does not detract from the importance or significance of this exchange of letters. It should be borne in mind that plaintiff's margin of profit a ton on the runner bars contracted for was not less than $30 a ton and that if the contract was for a specific tonnage, as it now asserts, plaintiff's profit therefrom was easily calculable and would have been not less than $114,000. This exchange of letters of May 23 and June 4, 1929, took place only a few days after the contract was negotiated. There is such a marked difference between a contract for a specific number of bars each day for two years on the one hand and the needs of the defendant's business on the other hand that we are firmly convinced that if plaintiff's president then thought, as he asserts now, that the contract was for a specific tonnage, he would have made some mention of that position in his letter of June 4, 1929, rather than accept defendant's characterization of the contract as being for requirements only and repeat that characterization in his own letter. The language of the parties in this exchange of letters was, we think, a spontaneous description of what both parties regarded and thought then as to the quantity of runner bars ordered under the contract.

Following the execution of the contract defendant experienced considerable delay in getting its plant into operation and it was not until late in 1929 or in January, 1930, that it was able to do so. It is undisputed that defendant's delay was a bona fide delay, that it was earnestly striving to get into operation and that it did not consciously or designedly breach its contract in so far as getting the plant into operation was concerned. Considering the magnitude of defendant's new

plant and the character of the machinery and equipment installed, the delay was not unusual. If this was a specific tonnage contract, requiring defendant to take three large and seven small runner bars a day for two years commencing approximately 60 days after May 21, 1929, as is now contended, why did not plaintiff ship bars to defendant in July, 1929, and thereafter as the deliveries became due without any request from the glass company? Surely its conception of the respective rights and obligations of the parties under the contract must have been at least as clear then as it was at the time of the trial. Yet it waited upon defendant's getting into operation and accommodated itself entirely to the glass company's needs. The evidence discloses that during the period of delay up to October, 1929, plaintiff was anxious for defendant's plant to start operating so that it might make deliveries and that it was disappointed that the plant did not get into operation sooner. No claim was made, however, at any time during that period that defendant was delinquent because of its failure to order runner bars nor was defendant advised of the interpretation of the contract for which plaintiff now contends. Plaintiff did deliver a carload of runner bars to defendant's plant on October 21, 1929, on a verbal order from Wolff, the glass company's superintendent. But the delay persisted and on November 1, 1929, the defendant's plant still not being ready to be placed in operation, plaintiff was advised by letter to ''not ship any more runner bars until further notice.'' This was merely a request deferring shipment and at the time it was not regarded by plaintiff as a breach of the contract, at least no claim was made that it was. The operations of defendant began to get into ''full swing'' late in 1929 and early in 1930, and, according to plaintiff, substantial shipments of runner bars were made commencing with the month ending January 31, 1930. Throughout the year 1930 bars were ordered by defendant as it needed them.

As heretofore shown, the general offices of the National Plate Glass Company were moved from Detroit, Michigan, to Ottawa, Illinois, in July, 1930, and subsequent to that time defendant's executive officers were at all times available. Although as of the month of July, 1930, defendant was delinquent in the number of runner bars it should have taken from plaintiff to the extent of approximately 1,236 tons under the latter's present interpretation of the contract, it is conceded that no complaint was made to Eckenrode, defendant's president, as to such delinquency. In September, 1930, Eckenrode and Wolff, president and superintendent, respectively, of defendant corporation, resigned and were succeeded by Paul Nesbit, who became vice president and general manager of its plants and offices at Ottawa, and John R. Tyson, who took the place of Mr. Wolff as superintendent. At that time defendant's delinquency under the construction of the contract, which plaintiff now asserts, amounted to 1,338 tons of runner bars, but no mention was made of such delinquency to the new officials nor was any complaint registered or demand made of them that defendant take and pay for such delinquent tonnage.

It will be recalled that the contract provided for a reduction in the price of runner bars contingent upon a drop in the price of pig iron. A reduction from $95 to $93 a ton was granted as of August, 1930, and at that time no complaint was made to defendant that it was delinquent under the contract nor was the interpretation of the contract advanced that is now contended for. As to his conference with Wolff when defendant asked for this reduction, plaintiff's president, Knowles, testified: "I told Mr. Wolff that the price of pig iron had been reduced, that we had passed a six months period, but I couldn't figure; I didn't know how to figure where that reduction should take place because they had not taken the tonnage that they had contracted for up to that time, so I was at sea whether

or not to put that reduction in or what tonnage to apply it on, or anything of the kind. He told me to let it go until they had got the complete operation of the plant and we ran along on the contract and the contract was for a duration of two years, and we would get together on it. I reduced it to $93.00.'' It will be noted that in this testimony Knowles did make an indefinite reference to tonnage that would be equally applicable under either construction of the contract. Still he made no definite complaint or protest that defendant was delinquent nor did he advance the interpretation of the contract plaintiff now seeks. In the latter part of September, 1930, Nesbit and Tyson, the new officials in charge of defendant's plant, met with Knowles and suggested to him that the price of the runner bars was too high and asked him for an arbitrary reduction. At that time defendant was delinquent to the extent of 1,438 tons of runner bars, according to plaintiff's present claim. Plaintiff granted the requested reduction to $85 a ton without even suggesting that the defendant was delinquent under the contract. If plaintiff thought then, as it contends now, that the contract was for a specific tonnage, what reasonable explanation is there for its failure to assert its construction at that time? Is it likely that if the construction which is now contended for was plaintiff's construction in September, 1930, it would have granted such a large reduction in the price of runner bars without even mentioning the delinquency?

During the balance of the year 1930 and up to July 1, 1931, about once each month the defendant ordered runner bars for the next succeeding month. Plaintiff acknowledged receipt of the written orders in evidence and filled all of the orders, whether verbal or written, without protest of any kind. The course of correspondence clearly shows that defendant ordered according to its needs. At times it would order 80 small bars and 20 large. On other occasions it would vary the propor-

tion of the respective sizes ordered. During the entire period from July 21, 1929, to July 1, 1931, the alleged delinquency continued to mount without any claim or protest on the part of plaintiff.

By a contract of sale dated June 30, 1931, defendant sold its plant to the Libbey-Owens-Ford Glass Company of Toledo, Ohio, the transfer to be effective as of July 1, 1931. Knowles testified that he knew of the existence of the negotiations leading to the sale and transfer. After the sale, in his letter to the Libbey-Owens-Ford Glass Company of July 7, 1931, Knowles said in part: ''We are pleased to learn of your purchase of the National Plate Glass Company's plants at Ottawa, Illinois, originally the Federal Plate Glass Company; which plants it has been our privilege to serve both in the course of their construction originally many years ago, and during their operation since.'' This letter initiated a chain of correspondence and conferences between plaintiff and officers of the Libbey-Owens-Ford Glass Company, which culminated in a contract dated July 31, 1931, whereby the latter company agreed to take its ''entire requirements'' of runner bars for the Ottawa plant from July 1, 1931, to June 30, 1932, at the price of $60 a ton in lieu of the price of $85 a ton that defendant had theretofore paid. The contract of July 31, 1931, carried this clause: ''This order cancels and supersedes contract dated May 21, 1929, between the National Plate Glass Company and the Knowles Foundry and Machine Company.'' At no time throughout the negotiations leading up to the execution of the contract with the Libbey-Owens-Ford Glass Company, providing for the reduction from $85 to $60 a ton did plaintiff make a complaint to defendant in respect to the alleged delinquent tonnage. If Knowles had entertained the view that the contract of May 21, 1929, from the date of its execution was a specific tonnage contract, yielding a most substantial profit, is it not strange that when plaintiff found itself faced with the loss of such profit that it

did not make some protest or demand indicating its construction of the contract? Not by so much as by a single letter, telephone call or statement did plaintiff advance the interpretation that the contract was for a specific tonnage or make complaint to defendant of any delinquency under the contract until Knowles made his visit to Fisher in July, 1932, which was even after the expiration of the Knowles Company's contract with Libbey-Owens-Ford Glass Company. Whether the legal effect of the provision of the foregoing contract, dated July 31, 1930, that "this order cancels and supersedes contract dated May 21, 1929, between the National Plate Glass Company and the Knowles Foundry and Machine Company" was to release defendant in any event from liability under the contract will be discussed later. However, that provision is significant as to plaintiff's attitude toward its contract with defendant. Its willingness at that time to agree to cancel same after defendant had sold its plant is just another indication that plaintiff regard the contract of May 21, 1929, as for defendant's requirements only and after the sale of its plant no longer a binding obligation.

Libbey-Owens-Ford Glass Company only operated the new Federal Division plant for about two months and then closed it down for two years. November 2, 1931, after said plant had ceased to operate, plaintiff sent a letter to Libbey-Owens-Ford Glass Company seeking "an arrangement of some kind . . . whereby we could supply at least a portion of the tonnage to your operating plants." This letter contained the highly significant statement that "when we entered into a contract with the National Plate Glass Company for Runner bars for their Federal Division we figured on a basis of *minimum tonnage* for two years." (Italics ours.) This express recognition by plaintiff that its contract with defendant was on a "basis of minimum tonnage" is hardly compatible with its present contention that it was for a specific tonnage.

S. C. Cripe's testimony that on the occasion of his conference with plaintiff's president at Toledo, Ohio, July 22, 1931, Knowles told him that "the National Plate had not taken out the castings that *he thought they would take, that he expected they would take*" was uncontradicted. This statement by Knowles to Cripe is, we think, a true expression of plaintiff's attitude and frame of mind toward the contract at the time it was made. It is a tacit admission that the contract was for requirements only. That Knowles was disappointed in his expectation that defendant would need, purchase and consume more runner bars than it did is clearly revealed by his statement. No obligation to take more castings is even intimated—just that he "thought" and "expected" that more would be taken.

Careful examination and analysis of all the facts and circumstances which occurred subsequent to the execution of the contract between plaintiff and defendant lead inevitably to the conclusion that the construction of the contract which plaintiff now seeks is an afterthought. No runner bars were shipped except as defendant's purchasing agent ordered them from time to time and no request was made of defendant's officers, senior or subordinate, that it take and pay for any delinquency. A major change took place in the executive personnel of defendant and the reduction in the contract price was accomplished without any objection on the part of plaintiff. The relations between the parties continued for many months after the change in price and defendant's new officers continued to order supplies of runner bars as needed, but still no protest was lodged. Even when defendant sold its plant to another corporation, plaintiff not only permitted the transfer to take place without claiming any delinquency but in its contract with the Libbey-Owens-Ford Glass Company agreed that the contract of May 21, 1929, be canceled and superseded by the contract with the new company.

Another reason for adopting the construction that the contract was for defendant's needs only is that plaintiff's president drafted the contract between it and defendant and it is an established principle of law that where a contract is prepared by a vendor, in case of doubt or ambiguity arising from the use of the language employed therein, it should be construed most favorably to the other party. (*Marx v. American Malting Co., supra; McClenathan v. Davis,* 243 Ill. 87.)

We are impelled to hold that the undisputed evidence, particularly the evidence as to the practical performance by the parties of the contract of May 21, 1929, is consistent only with the construction that said contract was for defendant's requirements and not for a specific tonnage of runner bars.

It is now necessary to determine whether the interpretation of the contract presented a question of law for the court to decide or a mixed question of law and fact for the jury to pass upon. Ordinarily the construction of a written contract and the rights and liabilities of the parties thereunder are matters of law resting exclusively with the court. Where evidence as to surrounding circumstances and the practical performance by the parties of a written contract is presented and examined by the court as an aid in the ascertainment of the proper construction to be given the instrument, if such evidence is uncontroverted, the function of interpretation remains with the court. It is only when the facts pertaining to the surrounding circumstances or concerning the practical performance by the parties are controverted that the interpretation of a contract must be submitted to the jury. (*Carstens Packing Co. v. Sterne & Son Co.,* 286 Ill. 355.) A careful search of the record fails to reveal any evidence upon which the contract could be fairly and reasonably construed as being for a specific tonnage of runner bars. In view of plaintiff's conduct during the entire life of the contract and for a long time thereafter, it

would be highly inequitable to allow any recovery against defendant in this action. Since there was no evidence presented from which, viewed in the light most favorable to plaintiff, it could be fairly inferred that the contract was for a specific number of runner bars a day for two years and as it is conceded that defendant took all of its requirements of runner bars from the Knowles Company, the trial court should have construed the contract at the close of all the evidence as a contract for requirements only and directed the jury to find the issues for defendant.

It is next contended that "the contract of May 21, 1929, between plaintiff and defendant was canceled and superseded by the contract between plaintiff and the Libbey-Owens-Ford Glass Company dated July 31, 1931." This defense, which was not involved in the prior appeal, is predicated, as heretofore indicated, upon the following provision of the last mentioned contract: "This order cancels and supersedes contract dated April 21, 1929, between the National Plate Glass Company and the Knowles Foundry and Machine Company." A special interrogatory as to whether or not the contract of May 21, 1929, was canceled and superseded was submitted to the jury, which answered "No" to same. Of the numerous questions involved in the instant contention, we deem it necessary to consider only defendant's assertion that as a donee beneficiary, the cancellation clause heretofore quoted affords it a complete and valid defense to plaintiff's claim, assuming that the contract of May 21, 1929, was for a specific tonnage. It has long been the rule in this State that where a contract is executed for the direct benefit of a third party, either creditor or donee, such third party may sue for a breach thereof. Considering this question in *Carson Pirie Scott & Co. v. Parrett*, 346 Ill. 252, it was said at p. 257: "The rule is settled in this state that if a contract be entered into for a direct benefit of a third person not a party thereto, such third person may sue for breach thereof. The test is whether the

benefit to the third person is direct to him or is but an incidental benefit to him arising from the contract. If direct he may sue on the contract; if incidental he has no right of recovery thereon. This rule has been announced without variation in numerous cases decided by this court.'' It follows that a third party direct beneficiary under a contract should be able to avail himself of the provisions thereof as a defense. But was it intended by plaintiff and the Libbey-Owens-Ford Glass Company that any benefit, either direct or incidental, should inure to defendant as a result of the contract dated July 31, 1931? The Libbey-Owens-Ford Glass Company had not assumed any obligation of defendant under the contract of May 21, 1929. The glass plant had been transferred and in so far as the record discloses the vendee of the plant had no further interest in defendant or reason to actuate it to protect or benefit its vendor in any way. As heretofore shown, one of the fundamental rules of construction of written contracts is to ascertain the intent and purpose of the contracting parties. The manifest purpose of the representative of the Libbey-Owens-Ford Glass Company in including the cancellation clause in the contract he negotiated with plaintiff was to protect his company from any claim that might possibly be made against it on the contract of May 21, 1929. Whether or not such representative had or did not have knowledge that the Libbey-Owens-Ford Glass Company had assumed no obligations of defendant, his purpose unquestionably was to protect his company against any contingency that might arise out of the contract of May 21, 1929. We are of opinion that the cancellation clause in the contract dated July 31, 1931, was not intended for the direct benefit of defendant and that it would not constitute a defense to plaintiff's claim if the contract of May 21, 1929, were held to be for a specific tonnage.

The remaining point urged by defendant for reversal has been carefully considered, but since we have concluded that the contract was intended to be for defend-

ant's requirements only and that it was so treated by the parties during the entire period of its duration it would serve no useful purpose to discuss same. To do so would unnecessarily prolong this already long opinion.

A motion heretofore made by defendant to dismiss plaintiff's cross appeal was reserved to hearing. The trial court after hearing arguments on defendant's motion for a new trial concluded that the damages as computed were excessive and indicated to plaintiff that the motion for a new trial would be allowed unless plaintiff filed a remittitur reducing the damages assessed to $40,314.60. Plaintiff filed its ''Consent to Remittitur,'' which waived objection ''to the further reduction by the Court of the damages assessed in this case from $57,947.40 to $40,314.60 . . . without waiving its right, in the event this cause should be reviewed by appeal, to assign cross-error upon the action of the court in ordering a reduction in the damages assessed by the jury and to move there to reinstate part or all of the amount required by the trial court to be remitted from said verdict.'' Plaintiff's position is that since the remittitur was of a qualified nature, it is entitled under the law to a review by cross appeal of the court's action in compelling the reduction in the amount of damages assessed by the jury. In *National Malleable Castings Co. v. Iroquois Steel Co.,* 333 Ill. 588, where cross error was assigned in the Supreme Court on the action of the Appellate Court in requiring a remittitur, the court held at p. 602: ''Defendant in error was not required to remit unless it saw fit. It did remit and is now in no position to complain.''

In 3 Corpus Juris, at p. 672, a note to sec. 546 reads:

''Where a motion for a new trial is granted, to go into effect unless plaintiff stipulates to reduce the verdict, in which event the motion is denied, plaintiff, by giving the stipulation and entering judgment thereon,

waives his right to appeal from the judgment, although he entered the remittitur under protest, and although the court may have been wrong in finding that the judgment was excessive."

The precise question was presented in *Iron R. Co. v. Mowery,* 36 Ohio St. 418, 38 Am. Rep. 597. That case had been tried in the court of common pleas and judgment was entered in favor of the plaintiff for $2,600. An appeal was taken to the district court, which entered the following judgment order:

"This cause was submitted to the court upon the petition and the assignment of errors therein, and was argued by counsel, on consideration whereof the court do find that there is no error therein, except in regard to the amount of damages assessed by the jury, which damages the court do find were excessive, and for that reason, a new trial ought to have been granted. The court, therefore, are of the opinion that, unless the damages in excess of fifteen hundred dollars are remitted by the defendant in error as of date of judgment, said judgment of the court of common pleas should be reversed; to which ruling of the court, that said damages are excessive, and in requiring said defendant in error to enter said remittitur of said damages, as a condition of affirmance of judgment, defendant in error excepts, and asks that his exceptions be noted, which is done. Thereupon said defendant in error, while not waiving, but insisting on his right to the whole amount, entered said remittitur to date as of time of judgment of damages in excess of fifteen hundred dollars; and said remittitur having been entered, it is considered by the court, that said judgment of the court of common pleas, with said remittitur so entered as of date of said judgment, be and the same is hereby affirmed with costs, and it is ordered that a special mandate be sent to the court of common pleas, to carry said judgment into execution."

In affirming the judgment in the reduced amount the Supreme Court of Ohio said at p. 423 of the heretofore mentioned Ohio report:

"The remaining question arises on the assignment in the cross petition, namely, that the court erred in finding the judgment to be excessive in amount, and in determining to reverse it for that reason, unless the plaintiff should enter a *remittitur* of the excess. The *remittitur* was entered for such excess, and judgment rendered for $1,500. In our opinion the plaintiff below is not in a position to object to the action of the court in this behalf.

"The defendant, under the finding of the district court, was entitled to a new trial, unless the necessity therefor was obviated by the action of the plaintiff. The court gave him his choice to accept a reversal of the judgment and a new trial upon the merits, or to remit the sum which, in the judgment of the court, was in excess of the amount that ought to have been recovered. The plaintiff elected to receive the amount of the judgment less the excess. By this election he was bound. He obtained a judgment for $1,500, which he would not have received had he not assented to the action of the court. That he assented reluctantly does not alter the case. By giving consent he became bound by the action of the court."

Defendant's motion to dismiss the cross appeal is allowed.

For the reasons stated herein the judgment of the superior court is reversed and judgment is entered here in favor of defendant and against plaintiff.

*Judgment reversed and judgment entered here.*

FRIEND and SCANLAN, JJ., concur.