Trompeter Construction Company, Plaintiff-Appellant, v. Norman P. Higby, Doing Business As Indian Head Syndicate Trust, and The Aetna Casualty and Surety Company, Defendants-Appellees.

### Gen. No. 11,243.

Second District, First Division.

April 29, 1959.

Rehearing denied and opinion modified October 7, 1959.

Released for publication October 7, 1959.

George L. Herbolsheimer, of LaSalle, and Pool & Langer, of Ottawa, and Berry & O'Conor, of Streator, for plaintiff-appellant.

Puklin & Nelson, of Aurora (Jerome Nelson, of counsel) for defendants-appellees.

JUSTICE DOVE delivered the opinion of the court.

Trompeter Construction Company, a corporation, brought this action in the Circuit Court of LaSalle County against Norman P. Higby, doing business as Indian Head Syndicate Trust, and The Aetna Casualty and Surety Company to recover damages for an alleged breach of contract. The defendants answered and Higby filed a counterclaim. Replies were filed and the issues made by the pleadings were submitted to a jury. At the conclusion of the evidence offered on behalf of the plaintiff and counterclaimant motions for an instructed verdict for the defendants and for the counter-defendant were granted and from appropriate judgments rendered upon the verdicts so returned, plaintiff and counterclaimant appeal, following the overruling of their several post-trial motions.

The record discloses that on August 22, 1952, plaintiff entered into a contract with the State of Illinois, whereby it agreed to construct a highway 3,697 feet in length south of the City of LaSalle. This contract required the plaintiff to remove 56,164 cubic yards of dump material, consisting of junk and garbage at a

unit price of 68¢ a cubic yard, and also required the removal, by plaintiff of 98,006 cubic yards of unsuitable earth material, consisting of muck encountered below the level of the present surface at a price of 78¢ per cubic yard.

On October 15, 1952, plaintiff entered into a subcontract with Higby. This subcontract made reference to the contract between plaintiff and the State of Illinois and recited that Higby desired to supply and operate an hydraulic dredging outfit to remove certain materials classed either as "dump material" or "unsuitable earth material," as set forth in plaintiff's contract with the state and proposed to perform hydraulic dredging and to provide and furnish all of the labor, machinery, plant equipment and means of construction, necessary tools, expendable equipment, insurance, superintendence and all utility and transportation services necessary to perform and complete in a workmanlike manner the hydraulic dredging in accordance with the plans and specifications prepared by the State of Illinois.

This subcontract, after the foregoing recitals, then provided that in consideration of the matters hereinafter set forth, it was mutually agreed that the materials included in the words "dump removal" or "unsuitable earth removal" (as modified by paragraph 2) shall be removed to the lines and grades as set forth in the plans, specifications and special provisions of the contract with the State of Illinois and are to be deposited in such locations outside the limits of the areas to be excavated that the company can reach with equipment for moving discharge pipe. The agreement then continues: "In the event the locations selected for such deposits exceed 1000 feet from the dredge, Higby shall be obliged to furnish at his expenses piping for the first 1000 feet and shall pay 55% of the rental cost of any needed additional pipe."

The contract then provided:

"2. It is expressly understood between both parties that the dredging operation undertaken herein includes only removal of materials up to and including four (4) inches in diameter or dimension on one side, and that all materials in excess of such dimension or any obstructions whatsoever to the dredging operation are to be removed expeditiously as the dredging operation progresses, by the Company and at its expense, provided the Company is given notice of the existence of such material by Higby, so as not to delay or hinder the effective operation of the dredge.

"3. The company agrees that it will furnish, at its own expense, such labor and equipment as is required to move that portion of the discharge lines outside the limits of the removal area.

"4. All expenses in connection with the above work, other than that mentioned in the preceding paragraphs 2 and 3, are to be borne by Higby.

"5. Preparation of the site for efficient hydraulic dredging and preparation of the disposal area and effective access to the work areas of the dredging operation, including ramps and roads, are to be provided by and at the expense of the Company.

"6. The company agrees to pay Higby as follows: The sum of Five Thousand One Hundred Fifty Dollars ($5,150.00) when above hydraulic unit is on the job, said payment to be made in the following manner: The sum of Three Thousand Dollars ($3,000.00) when the barge or pontoon sections are placed on the job, and the balance when all other equipment needed to make a working dredge is on the job and in successful operation. In addition to the above payments, when the hydraulic dredge is put in operation, the Company agrees to pay Higby the sum of Fifty Dollars ($50.00) per hour for each hour of dredging operation that said dredging outfit removes a minimum

of one hundred ten (110) cubic yards per hour of the above mentioned materials included in the words "dump removal" or "unsuitable earth removal" as designated in the plans and specifications heretofore referred to as modified by preceding paragraph 2, plus a compensation for waiting time as hereinafter specified. Measurement of the materials to be used as a basis for payment shall be taken over a period of twenty (20) hours of operation, minimum, and averaged over the time consumed in the measurement period. If the material removed does not equal the minimum guarantee of capacity, the Company shall pay that pro rata share of the materials actually pumped, at the agreed upon rate.

"7. If the dredge is delayed in its routine dredging operation by failure of the Company to remove oversize materials and obstructions, after notice to the Company of the existence of such material by Higby, the Company agrees to pay Higby for such delays so occasioned at the rate of Twenty Dollars ($20.00) per hour; provided, however, under-water obstructions which are not visible and may clog or hinder efficient operation are not to be considered as delays occasioned by the Company.

"8. It is further agreed that the Company will guarantee Higby a minimum of four hundred forty hours of operation at the above stipulated Fifty Dollars ($50.00) per hour, a total of Twenty-two Thousand Dollars ($22,000.00). Except for time lost due to delays which are occasioned by the Company, during which dredging cannot proceed, such guarantee shall not be effective unless four hundred forty (440) hours of operation are completed on or before December 15, 1952. This provision shall not effect payments provided for in paragraph 6 of this agreement.

"9. It is further agreed by and between the parties that no rental rate shall accrue to Higby while moving to the job site or from west of the road to

424

the east side of the road, or after conclusion of the work.

"10. Payments by the Company to Higby of the above stipulated Fifty Dollars ($50.00) per hour is a direct obligation of the Company and are due and shall be paid Higby immediately following the receipt by the Company of payments from the State of Illinois for "dump removal" or "unsuitable earth removal", and when the State Engineer has certified that a minimum of one hundred ten (110) cubic yards per hour of the above mentioned materials have been removed by Higby by hydraulic dredging operations during the period covered by the payment of the State of Illinois to the Company, but in any event, final payments of all monies due Higby shall be made within sixty (60) days after completion of the dredging operations requested by the Company.

"11. Mechanical breakdowns or causes over which the Company has no control shall not constitute time for which the above stipulated Fifty Dollars ($50.00) per hour shall be paid. Should the Company order operations stopped for any period of time other than for the reasons mentioned in this paragraph and in paragraph 7 wherein a special hourly rate is provided, a rental of Twenty Dollars ($20.00) per hour shall accrue to Higby for each hour of such stoppage.

"12. The Company shall pay to Higby a sum equal to the labor payroll of Higby each two weeks after dredging operations are started, such advance payments to be deducted from the payments set forth in paragraph 10 hereof.

"13. Should it be possible to move the hydraulic dredge to or from the Illinois River to the job sites by flotation, or should the Company order dredging operations to provide flotation to the job site, paying for the same at the rate of Fifty Dollars ($50.00) per hour, the sum of Twelve Hundred Dollars ($1,200.00) shall be deducted from the final payment to Higby.

"14. Work is to be started by October 28, 1952, and prosecuted diligently and consistently as directed by the Company, and in accordance with the plans and specifications, etc.

"15. Higby agrees to pay all just claims for material, supplies, tools, labor and all other just claims filed against him or any of his sub-contractors in carrying out the provisions of the within contract.

"16. Higby is to furnish to the Company a performance bond, and certificate of payment of premium thereon, and this Agreement shall not become effective until such bond covering this Agreement is supplied by Higby to the Company, and certificates showing coverage for property damage, public liability, Workmen's Compensation and Occupational Disease have been procured by Higby.

"17. This agreement shall be binding upon the respective successors of the parties hereto."

The record discloses that the performance bond called for in the 16th paragraph of the contract was furnished by Higby with the defendant Aetna Casualty and Surety Company, as surety. This bond is in the sum of $27,150. It recites that the principal, Higby, had entered into the contract of October 15, 1952, with the obligee therein named, Trompeter Construction Company, to perform hydraulic dredging according to said contract. The condition of the bond was that if Higby would fully indemnify and reimburse the construction company for any loss it might suffer through the failure of Higby to faithfully perform every obligation and duty imposed upon him by the contract at the time and in the manner therein specified then the obligation of the surety would be void, otherwise to remain in full force and virtue.

Philip J. Faletto, testified on behalf of the plaintiff that he was a civil engineer employed by the State Highway Department and came to this job on August 12, 1952, as a resident engineer; that he was

426

familiar with the work described in the original contract entered into by the construction company and the State of Illinois and that his duties were to give all grades and elevations and watch the job; that he was on the site where the work was being done every day and was familiar with the work done by Higby. This witness further testified that Higby's equipment arrived at the site of the work on October 29, 1952 and the work of assembling the dredge began; that he became acquainted with Higby and with his superintendent, Clarence Miller about that time; that they had considerable trouble with the hydraulic pump and the dredge first operated on November 26, 1952 and altogether 1200 cubic yards of unsuitable earth were removed by this process during the entire time Higby was working on this job.

Clarence E. Miller testified that he was Higby's foreman on this project in charge of the hydraulic dredge; that the dredge never worked efficiently, pumped around 75 cubic yards per hour but never pumped 110 cubic yards per hour as provided in the agreement. The record discloses that the total amount of material removed by Higby was 1200 cubic yards and on December 19, 1952 he ceased all dredging operations and did nothing further in connection therewith after that date.

The contract between plaintiff and the State of Illinois called for the removal of 56,164 cubic yards of dump material and 98,006 cubic yards of unsuitable earth material. Plaintiff had removed 52,500 cubic yards of dump material and approximately 37,000 cubic yards of unsuitable earth material prior to the execution of the agreement between plaintiff and Higby on October 15, 1952 so that at this time there remained about 3600 cubic yards of dump material and between 60,000 and 61,000 cubic yards of unsuitable earth to be removed. After Higby abandoned the project plaintiff removed this material at a cost of

427

$26,500 more than it would have cost plaintiff had Higby removed it at the price indicated in his contract with plaintiff and it is a judgment for this sum that plaintiff seeks in this proceeding.

Counsel for appellant insists that the contract which forms the basis of this action, imposes, upon Higby an obligation to remove all of the unsuitable material which remained to be removed at the time of the execution of the contract which was of a size of less than four inches in diameter. Counsel concede that there are no words used in the agreement which specifically require Higby to remove the designated materials to the lines and grades set forth in the specifications and as indicated in plaintiff's contract with the State of Illinois but insists that a fair interpretation of all the language used in this contract obligated Higby to remove these materials which were in place at the time of the execution of the agreement.

It is the contention of counsel for appellees that the agreement did not impose any contractual obligation on the defendant, Higby, to remove any specific or designated amount of materials described in the agreement; that what Higby did undertake, by the agreement, was to operate a hydraulic dredge and work diligently and consistently, as directed by the plaintiff, in removing such materials with a guarantee by the plaintiff of a minimum of 440 hours of operation at $50 per hour and at a minimum capacity of 110 cubic yards an hour, provided, however, that Higby completed such 440 hours of operation at such capacity on or before December 1, 1952 except for delays occasioned by the plaintiff.

What this contract says is that Higby desired to supply and operate a dredging outfit to remove certain materials referred to and described in the contract which the plaintiff had with the State of Illinois and that he proposed to perform hydraulic dredging

and to furnish the necessary labor and machinery to perform and complete in a workmanlike manner hydraulic dredging in accordance with plans and specifications prepared by the State of Illinois and by this contract Higby agreed that these materials should be removed to the lines and grades as set forth in the original contract with the State of Illinois and that these materials would be deposited in locations outside the limits of the excavated areas. While the contract did not say he, Higby, would do this work, the words employed either means that or it imposes no obligation on Higby to do anything. The Construction Company obligated itself to prepare the site for efficient hydraulic dredging.

By the contract plaintiff explicitly agreed to pay Higby $3000 when the barge or pontoon sections of the hydraulic unit is on the job and $2150 additional when the completed dredge is on the job and in successful operation and further agreed that after the dredge was in successful operation it would pay Higby $50 per hour for each hour of dredging operation during which the dredge removes not less than 110 cubic yards of materials per hour and if the material removed did not equal the minimum guarantee of capacity the plaintiff would pay the pro-rata share of the materials actually pumped at the agreed rate.

By the provisions of this contract plaintiff guaranteed Higby a minimum of 440 hours of operation at $50 per hour or a total of $22,000 but this guarantee was not effective unless 440 hours of operation are completed on or before December 15, 1952. The contract explicitly stated that work was to be started by October 28, 1952 and diligently prosecuted according to the plans and specifications and as directed by the company and beginning two weeks after operations were started, plaintiff was to pay Higby a sum equal to his, Higby's, payroll.

The parties to this contract must have understood that Higby was obligated to remove this material, otherwise all the agreement did was to give Higby an option to remove what materials he wished to remove. Certainly this could not have been contemplated by the parties when the other provisions of the agreement are considered. These other provisions required plaintiff to prepare the site and make substantial payments to Higby when the hydraulic unit was on the job and an additional sum as soon as it was in successful operation.

It was Higby who undertook this dredging operation and it was he who agreed to remove the materials to the lines and grades set forth in the principal contract which plaintiff had with the State of Illinois and it was Higby, not the plaintiff, who was to deposit these described materials in locations outside the limits of the areas to be excavated. It was Higby, according to the contract, who was to furnish the first 1000 feet of piping and pay one-half the rental cost of any additional pipe in the event the locations selected for such deposits exceeded 1000 feet from the dredge.

Prior to the parties entering into this contract, Higby made a written proposal to plaintiff in these words: "We propose to dredge and move up to 100,000 cubic yards of mixed silt loam on the following basis: 'Moving Costs $5,150.00; Dredge Rental $50.00 per hour; Minimum Rental Guarantee $22,000.00; and Maximum Overall Price Guarantee $46,000.00.'" This written proposal was offered in evidence as plaintiff's Exhibit 3 but the court refused to admit it on the theory that it was an attempt to vary or contradict the written contract, whereas the plaintiff asserted it was offered only to show the surrounding circumstances and transactions so that the court would be better able to determine the intention of the parties. From our

430

examination of this proposal, we do not see how it can be said that it contradicts or varies the contract actually entered into in any way. It serves to clarify their intentions. If there is any ambiguity in the contract it is as to who is to remove the unsuitable material. We think that without this exhibit the contract must be construed as we have indicated but considering the contract in the light of this exhibit there can be no doubt that Higby is the person who is to remove it.

In Knowles Foundry and Machine Co. v. National Plate Glass Co., 301 Ill. App. 128, an offer made about three months before the contract was entered into was admitted in evidence as an aid to help the court construe the contract. The same rule was followed in George C. Peterson Co. v. Timken Roller Bearing Co., 223 Ill. App. 53, and in Lincoln Mining Company v. Illinois Board of Education, 212 Ill. App. 586, where it was held that the facts and circumstances surrounding the negotiations of the parties prior to the actual entering into of the contract were admissible in construing a contract of the nature here involved.

██ It is well established in the law of contracts that an agreement must be construed in its entirety in order to ascertain the intention of the parties thereto, and where under the terms of a contract it is subject to two different interpretations, that interpretation will be adopted which gives to the contract some operative effect rather than that which renders it inoperative. (Minnesota Lumber Co. v. Whitebreast Coal Co., 160 Ill. 85; Torrence v. Shedd, 156 Ill. 194.) In the Torrence case, the court said: (pp. 211–212) "A contract should be construed in such a way as to make the obligations imposed by its terms mutually binding upon the parties, unless such construction is wholly negatived by the language used. (Bishop on Cont. sec. 417; Bangor Furnace Co. v. Magill, 108 Ill.

656). Courts will seek to discover and give effect to the intention of the parties, so that performance of the contract may be enforced according to the sense in which they mutually understood it at the time it was made; and greater regard is to be had to their clear intent than to any particular words which they may have used to express it."

An analysis of the language of this contract shows that Higby desired to supply and operate a hydraulic dredging outfit to remove the material classed as either "dump removal" or "unsuitable earth removal" and that he was to furnish all labor necessary to do so and pay all expenses in connection with the hydraulic dredging. If Higby was obligated to bear all the expenses of the operation he certainly must have intended to do the work. And as the plaintiff agreed to pay Higby $5,150 when the hydraulic unit was on the job why would plaintiff do this if Higby was not going to do any work? Higby was also guaranteed a minimum of $22,000 of dump removal work. If Higby had not agreed to do anything this guarantee would be unnecessary and meaningless. Higby was also to furnish a performance bond but why should he, if he had nothing to perform?

It is our conclusion that under this contract Higby obligated himself to remove the "dump removal" and the "unsuitable earth material" of less than 4 inches in diameter which remained in place on the date of the contract, October 15, 1952. The evidence at the close of plaintiff's case disclosed that he failed to do so. It was therefore error for the trial court to direct a verdict in his favor and the judgment rendered thereon will be reversed.

Under the construction placed on the contract by the trial court a directed verdict in favor of counter-defendant was proper. In view of our conclusion, however, the judgment rendered in favor of counter-

432

defendant will also be reversed and this cause will be remanded to the Circuit Court for a new trial.

Judgments reversed and cause remanded.

It is further ordered that the petition for rehearing be denied.

SPIVEY, P. J. and McNEAL, J., concur.