WALKER ELECTRIC CO. v. NEW YORK SHIPBUILDING CO.

(Circuit Court of Appeals, Third Circuit.  April 27, 1917.)

No. 2159.

1. ASSIGNMENTS ⬧=19—ASSIGNABILITY OF CONTRACT—NECESSITY OF CONSENT.
    While it is a general rule that a contract which can be as well performed by a subcontractor as by the principal is assignable, and while the usual test of assignability is whether the contract would survive to the personal representative of the assignor, these rules are subject to exceptions, one of which is that contracts embodying liabilities or duties which in express terms or by fair intendment from the nature of the liabilities themselves import reliance on the character, skill, business standing, par-

ticular experience or capacity of the parties, cannot be assigned by one: without the consent of the other.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. §§ 28–31.]

2. ASSIGNMENTS ⟨⟩19—ASSIGNABILITY OF CONTRACT—NECESSITY OF CONSENT.
    Under the prevailing practice, plans and specifications for the construction of a battleship are developed only as the work progresses, and contracts for construction, and subcontracts for parts or appliances, are based upon specifications for the last ship of the same type. These plans are subject to alteration arbitrarily at the will of the government, and an extra allowance is customarily made for alterations extending to something new not appearing on the type plan, but not for alterations which are merely a development of something in the type plan. *Held* that, in view of this practice and the consequent elasticity as to the character of the work and the amount of compensation, a subcontract for switchboards and electrical appliances involved the personal equation, and could not be assigned by the subcontractor without the consent of the general contractors.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. §§ 28–31.]

In Error to the District Court of the United States for the District of New Jersey; Thos. G. Haight, Judge.

Action by the Walker Electric Company against the New York Shipbuilding Company. Judgment for defendant, and plaintiff brings error. Affirmed.

Wm. K. Flanagan, of Newark, N. J., for plaintiff in error.

Thomas L. Gaskill and Joseph H. Gaskill, both of Camden, N. J., for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. Of the several questions involved in this controversy, two only are embraced in this decision. These are: Whether the trial court erred, first, in deciding as a matter of law that the contract sued upon was not assignable by one party without the consent of the other; and second, in refusing to permit the jury to determine upon an issue of fact whether that consent had been given.

These questions arose out of a contract, which upon first view appears perfectly simple and definite, but upon examination is shown to be quite the contrary.

New York Shipbuilding Company, being under contract with the United States for the construction of the battleship "Oklahoma," entered into a sub-contract with Walker Brothers, electrical engineering contractors, for switchboards to be used on that ship. The contract was made by correspondence under dates of June 14th and 15th 1912, and so far as expressed by its terms was briefly this: In consideration of $16,500, Walker Brothers agreed to furnish the Shipbuilding Company, for the Battleship "Oklahoma," two dynamo room generator switchboards; two distribution boards; two bus feeder panels; four turret distribution panel boards; (spare parts, Vandykes or tracings and drawings) to be built in accordance with specifications for U. S. S. "Oklahoma" issued by the Bureau of Steam Engineering,

Navy Department, 1911, and sales office specifications issued with approved drawings; subject to test and approval by the said Bureau, and under certain guaranties as to efficient and successful operation. On October 25, 1912, Walker Brothers assigned this contract to Walker Electric Company, the plaintiff, an altogether different concern, but under the express provision, however, that they would procure the consent of the Shipbuilding Company to the assignment, and in the event of their failure, no obligation of performance should rest upon the Electric Company.

The Electric Company proceeded to develop switchboard plans and submit them by blueprints to the Shipbuilding Company for its inspection and the government's approval, but in doing this, the Electric Company did not deal directly with the Shipbuilding Company. It submitted the plans and received them back with the government's criticisms and modifications through Walker Brothers, with whom the Shipbuilding Company was all the while dealing as the other party to the contract.

This continued for a year after the assignment before the Shipbuilding Company became aware that the contract had been assigned and that Walker Brothers no longer intended performing it. This knowledge was conveyed to the Shipbuilding Company by Walker Brothers, when as agreed, they endeavored to obtain the Shipbuilding Company's consent to the assignment and at a time when very considerable differences in the plans had been made, involving, as the Electric Company contended, material changes in the contract and great difference in cost, but involving as contended by the Shipbuilding Company, nothing that varied the contract or affected its initial price. The Electric Company demanded an increased price. This was refused by the Shipbuilding Company. Thereupon the Electric Company brought this suit, as assignee of the contract, to recover for moneys expended in preparing blueprints, plans and specifications, and for profits lost. Judgment of non-suit was entered upon the ground that the contract was unassignable without the consent of the Shipbuilding Company and that there was no evidence of such consent upon which a right of action in the Electric Company could be based or a verdict in its favor sustained.

[1] Notwithstanding the contract seemed very simple and appeared on its face to be a contract assignable without consent, the parties to the assignment themselves treated it as unassignable without the consent of the Shipbuilding Company, as evidenced by the condition or provision in which Walker Brothers undertook to procure its consent and by which the Electric Company protected itself from liability for non-performance until its consent had been obtained. The Electric Company, however, receded from that position and brought this action, upon the ground that the contract was assignable without the consent of the Shipbuilding Company. It based its case upon the contention of fact that the commodities contracted for were only such electrical appliances as any factory with proper equipment could turn out when supplied with specifications, and upon the principle of law applicable generally to such a fact that where a given contract can be as well performed by a sub-contractor as by

the principal, it is assignable. British Wagon Co. v. Lea, L. R. 5 Q. B. Div. 149. It relied further upon the rule that the test of assignability is whether the contract would survive to the personal representative of the assignor; King v. West Coast Grocery Co., 72 Wash. 132, 129 Pac. 1081; and applying this test to the contract as it interprets it, it now asks that we find the contract assignable.

There is no question that these general rules are well established, and when applicable, control; but to these general rules are exceptions which are equally well established. These rules and their exceptions are not difficult of definition. The difficulty lies in their application to a given case, which requires always a careful consideration of what in fact the contracting parties did and intended doing. A notable exception to the general rules stated has its rise in contractual situations involving personal relations, and is in effect, that contracts, embodying liabilities or duties which in express terms or by fair intendment *from the nature of the liabilities themselves* import reliance on the character, skill, business standing, particular experience or capacity of the parties, cannot be assigned by one without the consent of the other. British Wagon Co. v. Lea, L. R. 5 Q. B. Div. 149; Arkansas Valley Smelting Co. v. Belden Mfg. Co., 127 U. S. 379, 387, 8 Sup. Ct. 1308, 32 L. Ed. 246. This is for the reason that in such contracts, personal performance is the essence of the undertaking, and is an obligation which cannot be transferred to another without the consent of the person entitled to it. It is when such considerations do not appear in a contract by stipulation or fair intendment and when the undertaking can be performed as well by one as another, and therefore upon death survives, that a contract is assignable without the consent of the other party. British Wagon Co. v. Lea, L. R. 5 Q. B. Div. 149; Gribling v. Bohan, 26 Cal. App. 771, 148 Pac. 530; Devlin v. Major, 63 N. Y. 8; New England Trust Co. v. Gilbert E. R. R. Co., 91 N. Y. 153; Northwestern Cooperage and Lumber Co. v. Byers, 133 Mich. 534, 95 N. W. 529; Horst v. Roehm (C. C.) 84 Fed. 565.

What was in the contract between Walker Brothers and the Shipbuilding Company that made it different from what its terms seemed to import? What, if anything, was peculiar in the relation of the contracting parties?

[2] When a shipbuilding concern is awarded a contract by the United States government for the construction of a battleship, it is not supplied with detailed plans and specifications for every part, for these are made and developed only as the ship construction progresses. Therefore, when the Shipbuilding Company calls for sub-contracts for parts or appliances it cannot tender definite plans and specifications, for none exists. But specifications of some sort must be supplied both shipbuilder and the sub-contractor. So a practice has grown up to take the specifications with respect to a given part or appliance as they were when completed in the last ship of the same type. Thus in this instance, the specifications for switchboards in the Battleship "Arkansas" became the specifications for switchboards in the Battleship "Oklahoma." Upon them, both the principal contractor and sub-contractor based their bids. When the sub-contract for switchboards was let it

became the duty of the shipbuilder to furnish the sub-contractor with a plan of some sort. This was done under the practice by supplying what is termed a "type plan." A "type plan" presents a very general picture or "lay out" of the switchboard, but does not show the location or definite arrangement of parts. These must be determined and developed by the switchboard contractor and by him submitted in blueprints to the shipbuilder, who in turn must submit them to the Navy Bureau of Steam Engineering, to be by that Board changed and modified to conform to the new requirements of the ship as they develop in the course of the ship's construction, and to be by that Board ultimately approved before work is begun. Thus it was understood by all parties, principal contractor and sub-contractor, that from the very nature of the work, the detailed plans of the sub-contractor were subject to alteration arbitrarily at the will of the government. But here was a situation in which someone might suffer if alterations were radical or substantial. To meet this situation in the spirit of fairness, another practice had grown up between the government, principal contractors and the sub-contractors, to the effect that if an alteration involves something already on the type plan, it is termed "development," and being but the development of a thing of which the sub-contractor was informed by the type plan, no extra payment is allowed for it by the government to the shipbuilder, and, of course, none is allowed by the shipbuilder to the sub-contractor. If the alteration, however, extends to something new, that is, something not appearing upon the type plan and therefore something in addition to that of which the sub-contractor was informed when he entered into the contract, that constitutes a "change" for which the government, upon the shipbuilder's application, makes an allowance to the shipbuilder in extra payment, and when so allowed, the shipbuilder in turn makes the same allowance to the sub-contractor. Thus in this case it was understood by the government, the shipbuilder and the sub-contractor, that upon entering into the principal contract and sub-contract, it was impossible for all parties to foresee all requirements of the ship, and therefore it was impossible to contract definitely with reference to them, and that there was of necessity a certain elasticity as to the character of work and the amount of compensation under the contracts.

As stated by Walker, one of the sub-contracting firm, "There were a great many things understood without being mentioned at all." Therefore, in this instance the three parties appearing in this litigation knew that the contract between the shipbuilder and the sub-contractor for switchboards was subject to variation as to work and compensation. Into such a contract with such an understanding Walker Brothers entered, but when Walker Brothers came to assign their contract, with its elastic terms, Walker Electric Company, the assignee, was not disposed to rely upon these tacit understandings.

While willing to furnish the precise apparatus mentioned in the contract at the price stipulated, it refused to perform at the contract price the contract with its subsequent "development" and "change" alterations, being doubtful whether the alterations were "developments" or "changes" and uncertain how the United States Bureau of Steam Engineering, the arbiter of the matter, would decide them. It therefore

made its own list of extras as it conceived them, and demanded of the Shipbuilding Company a new contract price embracing those extras. This the Shipbuilding Company refused, maintaining that the alterations demanded by the government did not constitute alterations in the contract and would therefore not agree to a new price or give its consent to the assignment excepting at the old price. We have recited the situation at length in order to show that the contract was not an usual one and that the relation of the parties was something more than that which customarily exists between purchaser and seller of a fixed and definite commodity.

In determining whether it appears by fair intendment that in entering into the contract the Shipbuilding Company relied upon some specific qualification of Walker Brothers, which gave it the right to demand personal performance of their undertaking, we must consider first the subject matter of the contract and then the relation of the parties.

The subject matter was switchboards and appliances, a complicated piece of electrical machinery of limited details at the time the contract was made and to be determined in detail only as the contract progressed. While it is true that after details and specifications for the switchboards had become fixed and known, other concerns doubtless could have furnished them; but in contracting for the furnishing of such indefinite things, reliance had to be placed upon the willingness of a person to enter into such a contract and his willingness and capacity to complete it in view of its indefinite features and accompanying hazards as to compensation. This is acutely shown by the refusal of the Electric Company to perform the assigned contract until its uncertainties as to amount of work and measure of compensation were determined.

From such a transaction as this it is difficult to exclude the personal equation. Walker Brothers, though not manufacturers of electrical machinery, had been supplying such machinery for ships for ten or twelve years. They were known to be familiar with work of that type and had shown themselves capable of furnishing highly technical and involved electrical mechanism. In dealing with them to furnish switchboards for a battleship of a design then indefinite but to which the government would ultimately hold the shipbuilder, the Shipbuilding Company did not deal with them as a mere broker for the purchase of a staple article, but dealt with them upon a personal confidence based upon a previous business and technical experience. It can fairly be inferred from the contract and from the testimony produced by the plaintiff itself, that the Shipbuilding Company relied upon the technical capacity of Walker Brothers, and upon their willingness and business integrity to furnish again what they had furnished before in the same satisfactory way, and expected personal performance of their undertaking. We are therefore of opinion that the trial court committed no error in holding the contract unassignable without the consent of the Shipbuilding Company.

Whether the alterations upon which this controversy centers were in fact made by the government under its practice or by the defendant in abrogation of the contract, or whether there remains a right of ac-

tion by Walker Brothers or by the Electric Company in the name of Walker Brothers against the Shipbuilding Company, are questions not raised by this writ, and not considered in this opinion.

Upon the plaintiff's second contention that there was evidence upon which, if permitted, the jury might have found that the consent of the Shipbuilding Company to the assignment had been given, and that the court erred in not submitting that question to the jury, we may say without discussing the testimony that we find no such evidence. On the contrary, we think the plaintiff's evidence shows very clearly that the Shipbuilding Company refused to give its consent.

The judgment below is affirmed.