Stanley **CLAYMAN** and Melvin
Clayman, Appellants,

v.

**GOODMAN PROPERTIES, INC.**

No. 71–1238.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 25, 1972.

Decided Dec. 13, 1973.

Rehearing Denied Oct. 8, 1974.

Burton A. Schwalb, Washington, D. C., with whom Charles R. Donnenfeld, Washington, D. C., and Christopher Sanger, Gaithersburg, Md., were on the brief, for appellants.

Nelson Deckelbaum, Washington, D. C., for appellee.

Before FAHY, Senior Circuit Judge, and ROBINSON and WILKEY, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This appeal challenges a judgment of the District Court halting a suit in which appellants sought damages from appellee for an alleged breach of con-

tract. Stanley and Melvin Clayman, the appellants, assert that Goodman Properties, Inc., the appellee, dishonored an agreement entitling them to acquire a half interest in an apartment project. Goodman Properties says it justifiably terminated the agreement. At the conclusion of the parties' evidentiary presentations over four days of trial, the District Court directed a verdict for Goodman Properties, and the Claymans assign that action as error. We affirm.

I

Goodman Properties owns a 140-unit garden-type apartment project in Bladensburg, Maryland, formerly known as Gateway Apartments.[1] In the 1960's, the project had fallen into poor physical and financial condition. Until his death in August, 1969, the principal officer and stockholder of Goodman Properties was Reuben Goodman, a dermatologist and an investor, primarily in the stock market. For many years Dr. Goodman had known the Claymans,[2] who were dentists and also investors, mainly in real estate.[3] The Claymans had built several garden-type apartments, and were associated in the ownership and management of other similar properties.

In early 1968, Dr. Goodman and the Drs. Clayman conducted a series of talks centering on the problems of Gateway Apartments, which Dr. Goodman attributed to faulty management. The Claymans inspected Gateway Apartments, made recommendations to Dr. Goodman, and a business proposition soon emerged. It was, in the main, a proposal that the Claymans take over the management and rehabilitation of Gateway Apartments on a fee basis with an option to purchase a half interest therein. During the course of the negotiations, the Claymans introduced Dr. Goodman to David H. Hillman, and informed Dr. Goodman that they desired to bring him into the transaction. Hillman was a certified public accountant with some experience in property management, and in those capacities had performed satisfactorily for the Claymans in the past.[4] Dr. Goodman concurred, and Hillman became a participant along with the Claymans.[5]

The negotiations culminated in a written contract, dated April 1, 1968. The parties thereto were Goodman Properties, on the one side, and the Claymans and Hillman on the other.[6] The agreement required the latter to manage and renovate[7] Gateway Apartments, awarded them a fee on gross income,[8] and extended to them a one-year option to buy a 50 percent interest in the enterprise.[9]

---

1. Now known as Capital View Apartments.

2. The Claymans had been boyhood friends of Dr. Goodman's son, and Dr. Goodman advised Dr. Melvin Clayman in stock investments.

3. In the building in which they conducted a joint dental practice, the Claymans also maintained a separate office and staff for the management of their real estate interests. By devoting three days apiece to dentistry and three days to their real estate interests weekly, they were able to pursue both successfully. The Claymans were not licensed real estate brokers, and they engaged in real estate management and development only when they had a proprietary interest therein. See note 63, infra.

4. Hillman was the Claymans' accountant, the successful manager of property for them, and a partner in one of their real estate ventures.

5. See note 25, infra.

6. See text infra following note 22.

7. Among other duties, the Claymans and Hillman were "to rent, lease, operate and manage the" project; "[t]o make or cause to be made and supervise repairs and alterations, and to do decorating on" the premises; and to "renovat[e] . . . the premises with regard to signs, painting, landscaping, kitchen remodeling, etc., as shall in [their] discretion be required," for which latter purpose Goodman Properties bound itself to make the sum of $20,000 available.

8. The fee was 5% of monthly gross collections from rents, laundry machines and other sources except the swimming pool, subject to reduction to 4% in the event of exercise of the option. See note 27, infra.

9. Relevant details appear in text infra at notes 23–25, 27–28.

The term of the contract was one year initially and thereafter until canceled by one side or the other, subject to earlier termination on occurrence of any of certain specified contingencies.

During the months ensuing, the resuscitation of Gateway Apartments, both physically and financially, went forward. The premises were improved, rent scales were restructured and leases to tenants were strengthened. Although the project continued to operate at a deficit, the vacancy rate dropped,[10] gross receipts rose,[11] and cash distributions to Goodman Properties increased.[12] These were results of planning and execution in which the Claymans and Hillman each played some part.[13]

During the latter part of 1968, however, the arrangement began to deteriorate. As we have stated, Dr. Goodman died in August. In October, Hillman told counsel for Goodman Properties, that he would be terminating his association with the Claymans with respect to Gateway Apartments.[14] In late December or early January, counsel was informed that Hillman had dissolved his relationship with the Claymans, and that event marked the beginning of the end.

On or about January 7, 1969, counsel advised the Claymans of Goodman Properties' view that Hillman's disaffiliation constituted a breach of the contract between the parties. The contract, said the letter, "was entered into in reliance upon the performance of duties by the three parties as an entity." [15] Goodman Properties, the letter continued, was willing to commit the management of Gateway Apartments to the Claymans, but under a new contract mutually agreeable to those concerned. The letter inquired as to the wishes of the Claymans in that regard and suggested a meeting if they were interested. Subsequent correspondence between attorneys for the parties failed to resolve the matter, and no new contract eventuated. In late February, Goodman Properties served formal notice terminating the contract 60 days thereafter.[16]

The Claymans then instituted suit. Their theory is that they fulfilled their contractual obligations to Goodman Properties and became entitled, by an alleged exercise of the option, to acquire the agreed-upon half interest in Gateway Apartments. Because Goodman Properties refused to convey that interest, the complaint claimed damages for loss of the bargain. Goodman Properties, on the other hand, has insisted not only that Hillman's withdrawal violated the contract but also that the Claymans' failure to join Hillman as a party to the litigation was fatal.[17]

10. In March, 1968, the vacancy rate was 32%. By March, 1969, Gateway Apartments neared full occupancy.

11. The increase in gross receipts for the year ending March 31, 1969, was about 8% above the preceding year.

12. The distributions were three times larger than those prior to April, 1968.

13. Some activities were those of the Claymans alone and others followed consultation with Hillman. The latter also handled the accounting and other matters. The Claymans paid the salary of an employee who assisted Hillman in these respects, and also reimbursed Hillman for his overhead. A resident manager handled day-to-day matters.

14. By letter dated October 1, 1968, Hillman also notified the Claymans that after December 31 he would not participate as a general partner in another of their real estate enterprises. The letter stated that an increase in the demands of his accounting practice curtailed other activities and that "[i]n addition, the partnership's liabilities, which I have personally endorsed have seriously hampered my credit and borrowing ability." Hillman offered to turn his 10% interest in that enterprise over to the Claymans, and they accepted.

15. The letter makes unmistakable the reference to the Claymans and Hillman as "the three parties."

16. This was fully in conformity with the provision of the contract governing termination.

17. Before this suit was filed, the Claymans discussed with Hillman the possibility of his joinder. Hillman refused unless the Claymans would indemnify him against any counterclaims and litigation expense. That was

In its answer to the complaint, Goodman Properties first asserted that Hillman was an indispensible but unjoined party.[18] On the day before trial commenced, Goodman Properties filed a motion to dismiss the action on that ground. At the conclusion of opening statements, the District Court denied the motion without prejudice, and when the Claymans rested their case in chief, denied a motion for a directed verdict.[19] When, however, all of the evidence was in, the court directed a verdict in favor of Goodman Properties.[20] So it was that Hillman's disassociation with the Claymans in the Gateway Apartments venture exacted its full toll.

## II

██ In this court, the Claymans advance two grounds for their contention that the District Court erred in directing the verdict for Goodman Properties. The first is that, as a matter of law, Hillman's withdrawal from the Gateway Apartments venture was legally innocuous because the contract did not specifically require Hillman to personally perform anything in particular. The second ground is that, as a matter of fact, the circumstances surrounding formation of the contract show that the Claymans' expected contributions to the enterprise was its vital concern and that Hillman's participation was not a condition material to exercise of the option. So, the Claymans argue, the District Court should either have directed a verdict in their favor or submitted the case to the jury for determinations as to the intentions of the parties and the substantiality of any breach caused by Hillman's departure. Goodman Properties, on the other hand, reasserts its position that the absence of Hillman as a litigant requires dismissal of the suit, a premise which the District Court accepted.[21] The question initially confronting us is whether the contract summoned the Claymans and Hillman to a standard of performance which less than all three could not possibly meet.[22]

██ In the language of the contract, it is "between Goodman Properties, Inc.," which "hereinafter [is] called the 'Owner,'" and "Melvin Clayman, Stanley

not done, so Hillman did not join, nor has he sought to intervene in the litigation. The record discloses that in late April, 1969— after expiration of the contract in suit— Goodman Properties engaged as manager of Gateway Apartments a realty company in which Hillman is a 50% partner.

18. See Fed.R.Civ.P. 12(b)(7), 12(h)(3), 19.

19. See Fed.R.Civ.P. 50(a).

20. See note 21, *infra,* and accompanying text.

21. While direction of the verdict was predicated on that ground, the colloquy between court and counsel attests the court's awareness that Hillman's indispensability to the lawsuit portended his indispensability to performance of the option conditions. Without intimating a view on the procedural problem, we rest our decision on the substantive considerations.

22. In the process of interpreting the contract, and to the extent that legal principles influence the interpretation, we apply the law of the District of Columbia. While the Gateway Apartments project is situated just outside the District in Maryland, it is the District, on the issue of contract construction, that bears the more significant relationship to the parties and the transaction. See Fowler v. A & A Co., 262 A.2d 344, 348 (D.C.App.1970); Restatement (Second) of Conflict of Laws §§ 188, 204 (1971). Goodman Properties, a moving spirit in the transaction, is a District corporation, and its principal place of business is in the District. The Claymans, the other prime movers, likewise maintain their place of business in the District. The record discloses that the contract negotiations occurred predominantly in the District; the contract was hammered out by lawyers practicing in the District, and seemingly was executed in the District. The subject of the contract is not the ordinary sale and purchase of real estate but rather the formation of a business venture; the issues in litigation concern not the essential validity of the contract but rather its meaning. So the contacts possessing by far the greater importance to the task of interpretation are those with the District. Compare Maloney v. E. I. Du Pont de Nemours & Co., 122 U.S.App.D.C. 268, 270, 352 F.2d 936, 938, cert. denied, 383 U.S. 948, 86 S.Ct. 1201, 16 L.Ed.2d 210 (1965).

Clayman, and David Hillman, jointly hereinafter called 'Prospective Purchaser' " or " 'purchaser.' " Goodman Properties says the word "jointly" removes any doubt as to the parties' purpose to benefit and burden the Claymans and Hillman integrally rather than severally.[23] The Claymans say, however, that "jointly," taken in conjunction with the language immediately following, "merely describes the three parties and does not mean that all three had to do everything as a group."[24] We do not pause to resolve the dispute on this aspect of the contract for we are satisfied that for a more important reason the contract was substantively joint as to the Claymans and Hillman.[25]

■■ We have had occasion in the fairly recent past to point out that "[t]he general rule is 'that the obligation created by the promise of several persons is joint unless the contrary is made evident.' "[26] The contract before us falls squarely within the ambit of

---

23. "Co-promisors are liable (1) jointly if all of them have promised the entire performance; or (2) severally if they have promised separate performances." Welch v. Sherwin, 112 U.S.App.D.C. 124, 126 n. 3, 300 F.2d 716, 718 n. 3 (1962).

24. Brief for Appellants 20. Thus the argument seeks to capitalize on the absence of a comma after "jointly." But punctuation "is a most fallible guide by which to interpret a writing," Ewing's Lessee v. Burnett, 36 U.S. (11 Pet.) 41, 53, 9 L.Ed. 624 (1837) ; see also Holmes v. Phenix Ins. Co., 98 F. 240, 241, 47 L.R.A. 308 (8th Cir. 1899) ; Casriel v. King, 2 N.J. 45, 65 A.2d 514, 516 (1949), and it never prevails over a meaning which emerges plainly from a consideration of the entire document. Ewing's Lessee v. Burnett, *supra*, 36 U.S. (11 Pet.) at 41, 9 L.Ed. 624; Holmes v. Phenix Ins. Co., *supra*, 98 F. at 241; Casriel v. King, *supra*, 65 A.2d at 516.

25. We note in passing the strong indication by the record that the jury could hardly have failed to find that the parties unmistakably intended that the obligations of the Claymans and Hillman were indivisible. The evidence at trial shows that when the Claymans informed Dr. Goodman that they planned to bring Hillman into the transaction, Dr. Goodman made it known that "[h]is prior experiences with other property managers [had] led to the conclusion that the property would never become a financial success, unless the person actually running the day-to-day operations of the project had some personal interest in the same." The evidence further discloses that the original draft of the contract designated Goodman Properties as the party of one part and the Claymans and Hillman "jointly and severally" as parties of the other part; that Dr. Goodman insisted that the words "and severally" be deleted to require that all three act jointly in the matter; and that the three and their attorney agreed to the change without debate. Counsel who had represent-

ed Goodman Properties in the contract negotiations testified:

Q. Did you tell specifically . . . why Dr. Goodman wanted to deal with all three of these people?

A. I'm sure I did. I'm sure I told him as I told the others that Dr. Goodman had experienced bad management problems in this property by virtue of having a company which was a little bit unrelated to the property itself. . . . We never really had a continuity of interest on behalf of the management of the property, and it was Dr. Goodman's desire to have someone involved in this property who was directly related to the property, who had an interest in it, and not merely title holders and never know who he would be dealing with. And, therefore, there was insistence on the use of the word "jointly" because we were dealing with these people as a unit.

In similar vein, Hillman testified :

Q. . . . Now, in negotiating for this contract, . . . do you recall whether or not there was any discussion between the parties relative to the words "jointly and severally," which were contained in the original contract and stricken?

A. There was some discussion.

Q. What was the discussion?

A. The discussion was that the Goodman interests wanted the parties jointly liable, because they were interested in making sure that there were three persons responsible, and that they were dealing with three people, and intended to deal with three people throughout.

Since this testimony was uncontradicted, there is no reason to assume that the jury would not have readily accepted it.

26. Welch v. Sherwin, *supra* note 23, 112 U.S.App.D.C. at 126, 300 F.2d at 718, quoting 2 Williston, Contracts § 323 (1936). *Accord*, St. Regis Paper Co. v. Stuart, 214 F. 2d 762, 766 (1st Cir. 1954), cert. denied, 348 U.S. 915, 75 S.Ct. 296, 99 L.Ed. 717 (1955) ;

that principle. Throughout the contract, Goodman Properties is referred to by the word "owner." Similarly, the Claymans and Hillman are invariably referred to collectively by the words "prospective purchaser" or "purchaser," always in the singular. Nowhere does the contract distinguish the three in any way, or separate the rights and obligations among them. On the contrary, the contract uniformly treats the three as a team, without so much as a whisper that they are to be differentiated in any wise for any purpose.

That, which is so true of the contract in general is equally so of the option provisions in particular. "The owner hereby grants to the purchaser an option to purchase," it reads, upon the terms and conditions laid upon "the purchaser." [27] This formulation, devoid of any language of severance,[28] plainly binds the Claymans and Hillman together to a performance of conditions precedent to exercise of the option.[29] To be sure, the option provision does not

in so many words characterize the obligation to perform as entire and indivisible. The point, however, is not whether the contract expressly describes an obligation of two or more as joint, but whether it makes it manifest that the obligation is several.[30] Here the completely undivided nature of the performance called for refutes the thesis that it could legitimately be undertaken by only two of the three.[31]

■ We are mindful that the common law requirement that joint contractors sue and be sued jointly has been altered in the District of Columbia by statute,[32] but that change has no bearing on the substantive aspects of this litigation. The District statute provides merely that "[f]or the purpose of action thereon" contracts and obligations entered into by two or more persons are "deemed to be joint and several." [33] As the quoted language indicates and our decisions make evident, the statute does not affect the substantive rights and duties of the parties. Many years ago this

Tradewell Foods v. New York Credit Men's Adjustment Bureau, 179 F.2d 567, 569 (2d Cir. 1950) ; United States Printing & Lithograph Co. v. Powers, 233 N.Y. 143, 152, 135 N.E. 225, 227 (1922) ; Morrison v. American Sur. Co., 224 Pa. 41, 73 A. 10, 11 (1909) ; Restatement of Contracts § 112 (1932).

27. The option provision, in its entirety, reads :

The owner hereby grants to the purchaser an option to purchase at any time during the first twelve months following the date hereof one-half (½) of the subject premises for the sum of Ten and no/100 ($10.00) Dollars and the purchaser's assumption one-half (½) of the outstanding mortgage indebtedness together with an assumption of one-half (½) of all costs and expenses incident to the maintaining and operating of the premises from the date of exercising option. In the event the purchaser elects to exercise the option herein granted, the purchaser warrants as additional consideration therefor to reduce the purchaser's commission of five percent (5%) herein designated to four percent (4%) and to reimburse to the owner one-half (½) of such portion of the Twenty Thousand and no/100 ($20,000.00) Dollars capital funds as shall have been actually spent under the provisions of this

agreement. In the event the purchaser shall elect to exercise the option herein provided, all costs and expenses incident to the recordation or transfer of the property to the combined ownership of owner and purchaser shall be borne by the owner and purchaser equally.

28. Compare Welch v. Sherwin, *supra* note 23, 112 U.S.App.D.C. at 126, 300 F.2d at 718.

29. That is, in the event of election to exercise the option.

30. See text *supra* at note 26.

31. Compare Welch v. Sherwin, *supra* note 23, 112 U.S.App.D.C. at 126, 300 F.2d at 718.

32. D.C.Code § 16–2101 (1973) provides :

For the purposes of action thereon, a contract or obligation entered into by two or more persons, whether :

(1) the persons are partners or joint contractors ;

(2) the contract is under seal or not ;

(3) it is written or verbal ;. or

(4) it is expressed to be joint and several or not—is deemed to be joint and several.

33. See note 32, *supra*.

court, addressing a predecessor provision, admonished that

> It merely affects the remedy. It relates only to procedure. It does not convert a joint instrument into a joint and several instrument, or change a joint obligor into a joint and several obligor. The contract and the relations of the obligations of the contractors remain unchanged.[34]

More recently, we cautioned that another—a later—predecessor did "not determine, of course, whether each co-promisor has agreed to be liable for the entire performance or only for a part thereof."[35] "That determination," we said, "is governed by the terms of the contract."[36]

■ It cannot be doubted that the current statute embodies the same limitation. It is but a recodification of earlier versions,[37] and in terms it applies only "[f]or the purposes of action."[38] Consequently, it has no bearing on the present discussion. We have long been wedded to the proposition that "any number of persons may bind themselves *jointly* for the performance of one entire duty, and so become sureties for one another for the performance of the thing contracted to be done."[39] Wheth-

er they do or not depends upon the contract they choose to make.[40] We reaffirm these principles today.

■ In these views, we perceive no basis for resort to evidence depicting the circumstances surrounding the making of the contract before us. We need do little more than reiterate that "[t]he parol evidence rule requires that '[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.'"[41] The consequences which the law attaches to a written contract are as much a part of it as the terms it sets forth, and the legal effect of the contract can no more be changed or modified by parol evidence than it could have had it been made express.[42] The law ascribes to the contractual obligation of two or more a joint character unless the contract makes evident an intention that a several performance is to be indulged.[43] That legal incident of the option in suit cannot be abrogated by recourse to evidence extrinsic to the contract.[44]

34. White v. Connecticut Gen. Life Ins. Co., 34 App.D.C. 460, 468 (1910).

35. Welch v. Sherwin, *supra* note 23, 112 U.S.App.D.C. at 126 n. 3, 300 F.2d at 718 n. 3.

36. *Id.*

37. See revision notes to D.C.Code § 16–2101 (1973).

38. See note 32, *supra.*

39. Love v. Stidham, 18 App.D.C. 306, 314 (1901) (emphasis in original).

40. See Welch v. Sherwin, *supra* note 23, 112 U.S.App.D.C. at 126 n. 3, 300 F.2d at 718 n. 3; Hensler v. City of Los Angeles, 124 Cal. App.2d 71, 268 P.2d 12, 18 (1954).

41. Murray v. Lichtman, 119 U.S.App.D.C. 250, 252, 339 F.2d 749, 751 (1964). See also Gibson v. United States, 106 U.S.App. D.C. 10, 12–13, 268 F.2d 586, 588–589 (1959).

42. Calpetro Producers' Syndicate v. Charles M. Woods Co., 206 Cal. 246, 274 P. 65, 68 (1929); Colorado Woman's College v. Bradford-Robinson Printing Co., 114 Colo. 237, 157 P.2d 612, 614 (1945); Paul v. University Motor Sales Co., 283 Mich. 587, 278 N.W. 714, 719 (1938); Jimmerson v. Troy Seed Co., 236 Minn. 395, 53 N.W.2d 273, 277 (1952); Ross v. Stricker, 275 P.2d 991, 994 (Okl.Sup.Ct.1953); King v. Commercial Fin. Co., 163 Va. 260, 175 S.E. 733, 735 (1934).

43. See text *supra* at note 26.

44. A common application of the controlling principle is found in instances of contracts which omit specification of a time for performance. Since the legal effect of such a contract is that it is to be performed within a reasonable time, parol evidence is inadmissible to show an understanding that it would be performed at a particular time. Colorado Woman's College v. Bradford-Robinson Printing Co., *supra* note 42, 157 P.2d at

We conclude, then, that in the case at bar the jury had no function to perform with respect to ascertainment of the joint or several nature of the contract. Construction of unambiguous features of a written contract is a problem for the court, not the jury.[45] Put another way, the legal effect of reasonably clear terms of a contract is a question of law for judges.[46] The admissibility of extrinsic evidence, and possible need for the jury to assess it, depend upon the existence of an ambiguity in the contract.[47] Only if its meaning is dubious, and the evidence of the parties' intention is uncertain or conflicting, is there appropriate occasion to seek the conclusion of jurors as to what was in mind.[48] Moreover, the question whether the contract is ambiguous or not is one of law to be determined by the court.[49] A contract is not ambiguous simply because the parties disagree

on its interpretation,[50] and we see nothing in this case beyond that.

### III

There remains, however, the question whether Hillman's disaffiliation with the Gateway Apartments project was an event sufficiently material to justify the refusal of Goodman Properties to accept the Clayman's effort to exercise the option. Although the contract enumerates several contingencies furnishing ground for terminating the contract, we find none specifically referable to withdrawal of one of the optionees. We turn, then, to well settled legal principles for assistance in the resolution of this facet of the litigation.[51]

In the main, a party to a bilateral contract is entitled to the performance he bargained for. He may insist upon a performance by the other party which conditions his own duty to perform.[52] In any case, he may demand,

---

615; Gluckman v. Holzman, 30 Del.Ch. 60, 53 A.2d 246, 247 (1947); Dries v. Trenton Oil Co., 17 N.J.Super. 591, 86 A.2d 427, 429 (1952); Brazil v. Dupree, 197 Or. 581, 254 P.2d 1041, 1044 (1953).

45. Battista v. Horton, Myers & Raymond, 76 U.S.App.D.C. 1, 3, 128 F.2d 29, 31 (1942); McReynolds v. Mortgage & Acceptance Corp., 56 App.D.C. 342, 343, 13 F.2d 313, 314 (1926); Turner v. Mertz, 55 App.D.C. 177, 180, 3 F.2d 348, 351, 39 A.L.R. 1140 (1925); Cowal v. Hopkins, 229 A.2d 452, 454 (D.C.App.1967); Rich v. Sills, 130 A.2d 920, 922 (D.C.Mun.App.1957); Arsenault v. Angle, 43 A.2d 709, 711 (D.C.Mun.App. 1945).

46. See Turner v. Mertz, *supra* note 45, 55 App.D.C. at 180, 3 F.2d at 351; Arsenault v. Angle, *supra* note 45, 43 A.2d at 711.

47. News Union of Baltimore v. NLRB, 129 U.S.App.D.C. 272, 277, 393 F.2d 673, 678 (1968); Vakas v. Manuel, 114 U.S.App.D.C. 368, 369, 316 F.2d 369, 370 (1963); H. Herfurth, Jr., Inc. v. United States, 66 App.D.C. 220, 225, 85 F.2d 719, 724 (1936); Downs v. Bankhead, 44 App.D.C. 101, 105 (1915); Tyssowski v. F. H. Smith Co., 35 App.D.C. 403, 407 (1910); Atlantic Ref. Co. v. Wyoming Nat'l Bank, 356 Pa. 226, 51 A.2d 719, 723 (1947).

48. Rich v. Sills, *supra* note 45, 130 A.2d at 922; Roberts v. Veterans Cooperative Hous-

ing Ass'n, 88 A.2d 324, 326 (D.C.Mun.App. 1952); Bovello v. Falvey Granite Co., 71 A. 2d 536, 537–538 (D.C.Mun.App.1950); Knowles Foundry & Mach. Co. v. National Plate Glass Co., 301 Ill.App. 128, 21 N.E.2d 913, 930 (1939); Montauk Corp. v. Seeds, 215 Md. 491, 138 A.2d 907, 910 (1958); Terminal Constr. Corp. v. Bergen County Hackensack River Sanitary Sewer Dist. Authority, 18 N.J. 294, 113 A.2d 787, 795 (1955).

49. Pipkin v. FMC Corp., 427 F.2d 353, 356 (5th Cir. 1970); Tennessee Consol. Coal Co. v. UMW, 416 F.2d 1192, 1198 (6th Cir. 1969), cert. denied, 397 U.S. 964, 90 S.Ct. 999, 25 L.Ed.2d 256 (1970); Whiting Stoker Co. v. Chicago Stoker Corp., 171 F.2d 248, 251 (7th Cir. 1948), cert. denied, 337 U.S. 915, 69 S.Ct. 1155, 93 L.Ed. 1725 (1949); Eastmount Constr. Co. v. Transport Mfg. & Equip. Co., 301 F.2d 34, 41 (8th Cir. 1962); Airborne Freight Corp. v. McPherson, 427 F.2d 1283, 1285 (9th Cir. 1970); Dixon v. Wilson, 192 A.2d 289, 291 (D.C.App.1963); Friedman v. Thomas J. Fisher & Co., 88 A. 2d 321, 322 (D.C.Mun.App.1952).

50. Dixon v. Wilson, *supra* note 49.

51. See note 22, *supra*.

52. Merando v. Mathy, 80 U.S.App.D.C. 281, 282, 152 F.2d 21, 22 (1945), cert. denied, 327 U.S. 804, 66 S.Ct. 966, 90 L.Ed. 1029 (1946); Friedman v. Decatur Corp., 77 U.

in the way of the other's performance, substantial compliance with the terms of the contract.[53] In most cases—perhaps all but a relatively few—a promisor's tender in good faith of a performance fully in compliance with the contract save for minor and unimportant deviations avoids a breach enabling the promisee to escape his obligations thereunder.[54]

When, however, the contract stipulates a performance involving a highly personal element, it is obvious that a performance lacking that element does not measure up. Contracts calling for professional services as an attorney[55] or a physician[56] exemplify performances too personal to permit imposition of the services of another upon the promisee.[57] Similarly, contracts extending financial credit or trust to a contracting party are of such a personal nature that substitution of another in his stead does not legally suffice.[58] "[E]very one," says the Supreme Court, "has a right to select and determine with whom he will contract, and cannot have another person thrust upon him without his consent." [59] He also, says the Court, has "the right to the benefit [he] anticipate[s] from the character, credit and substance of the party with whom [he] contract[s]." [60] Moreover, says another court, "[i]t is competent for the parties to make any contract a personal one no matter what the subject-matter." [61] Professional skill and financial integrity are qualities as to which everyone is prone to exercise a high degree of selectivity—a prerogative upon which all would-be contractors may insist. The opinion neither of judge nor

S.App.D.C. 326, 328, 135 F.2d 812, 814 (1943) ; Miller v. Schwinn, Inc., 72 App.D.C. 282, 284, 113 F.2d 748, 753 (1940) ; Burke v. Thomas J. Fisher & Co., 127 F.Supp. 1, 3 (D.D.C.), aff'd, 95 U.S.App.D.C. 85, 219 F. 2d 767 (1955) ; Minmar Builders, Inc. v. Beltway Excavators, Inc., 246 A.2d 784, 787–788 (D.C.App.1968) ; Royal McBee Corp. v. Bryant, 217 A.2d 603, 607 (D.C. App.1966).

53. Turner v. Henning, 49 App.D.C. 183, 184, 262 F. 637, 638 (1920) ; Ballou v. Basic Constr. Co., 407 F.2d 1137, 1140–1141 (4th Cir. 1969) ; United States v. E. J. Briggs Constr. Co., 116 F.2d 768, 774 (7th Cir. 1941) ; Cox v. Fremont County Pub. Bldg. Authority, 415 F.2d 882, 885–887 (10th Cir. 1969) ; Baer Bros. Land & Cattle Co. v. Reed, 197 F.2d 569, 572–573 (10th Cir. 1952) ; Matthew A. Welch & Sons, Inc. v. Bird, 193 A.2d 736, 738 (D.C.App.1963).

54. See cases cited *supra* note 53.

55. *E. g.*, Sloan v. Williams, 138 Ill. 43, 27 N.E. 531, 532 (1891) ; Corson v. Lewis, 77 Neb. 446, 109 N.W. 735, 736 (1906).

56. *E. g.*, Deaton v. Lawson, 40 Wash. 486, 82 P. 879, 880 (1905).

57. See also Walker Elec. Co. v. New York Shipbuilding Co., 241 F. 569, 572–575 (3d Cir. 1917) ; Standard Chautauqua System v. Gift, 120 Kan. 101, 242 P. 145, 146 (1926) ; Citizens' Bank & Trust Co. v. Barthet, 177 La. 652, 148 So. 906, 908 (1933) ; Eastern Advertising Co. v. McGaw, 89 Md. 72, 42 A. 923, 924–926 (1899) ; New England Cabinet

Works v. Morris, 226 Mass. 246, 115 N.E. 315, 316–317 (1917) ; De Atley v. Streit, 81 Mont. 382, 263 P. 967, 971 (1928).

58. Arkansas Valley Smelting Co. v. Belden Mining Co., 127 U.S. 379, 387–388, 8 S.Ct. 1308, 32 L.Ed. 246 (1888) ; Wetherell Bros. Co. v. United States Steel Co., 105 F.Supp. 81, 85–86 (D.Mass.1952), aff'd, 200 F.2d 761 (1st Cir. 1953) ; Sims v. Cordele Ice Co., 119 Ga. 597, 46 S.E. 841, 843 (1904) ; Harney v. Hellgren, 322 Ill. 126, 152 N.E. 481, 483 (1926) ; Salmon Lake Seed Co. v. Frontier Trust Co., 130 Me. 69, 153 A. 671, 673–674 (1931) ; E. M. Loews, Inc. v. Deutschmann, 344 Mass. 765, 184 N.E.2d 55, 56 (1962) ; D. C. Hardy Implement Co. v. South Bend Iron Works, 129 Mo. 222, 31 S. W. 599 (1895) ; Kutschinski v. Thompson, 101 N.J.Eq. 649, 138 A. 569, 571 (1927) ; New York Bank Note Co. v. Hamilton Bank Note Engraving & Printing Co., 180 N.Y. 280, 73 N.E. 48, 51–52 (1905) ; Menger v. Ward, 87 Tex. 622, 30 S.W. 853, 854–855 (1895) ; Kinman v. Howard, 465 S.W.2d 400, 401 (Tex.Civ.App.1971) ; J. Maury Dove Co. v. New River Coal Co., 150 Va. 796, 143 S.E. 317, 327 (1928).

59. Arkansas Valley Smelting Co. v. Belden Mining Co., *supra* note 58, 127 U.S. at 387, 8 S.Ct. at 1309. See also Kinman v. Howard, *supra* note 58, 465 S.W.2d at 401.

60. Humble v. Hunter, 116 Eng.Rep. 885, 887 (Ex. 1848).

61. Frissell v. Nichols, 94 Fla. 403, 114 So. 431, 434 (1927)

juror as to the capabilities of a replacement is acceptable as a substitute for the promisee's own judgment and tastes in the matter.[62]

We need not assay Hillman's disassociation in terms of its effect upon the management and rehabilitation of Gateway Apartments, notwithstanding that otherwise he presumably would have contributed some personal service toward those activities.[63] Nor need we consider the disassociation in relation to cash payments [64] which the contract bound the optionees to make to Goodman Properties upon consummation of the option.[65] There is, however, an option condition which, as a matter of law, the Claymans cannot satisfy without a concurrent performance by Hillman, and that is catastrophic to their lawsuit.[66]

The contract requires the optionees, upon an exercise of the option, to assume one-half of a large mortgage indebtedness on the property.[67] We carefully note that the requirement is an assumption of half of the outstanding balance, as distinguished from acceptance of a half interest in Gateway Apartments subject to the mortgage.[68] Upon such an assumption, the optionees would become personally liable along with Goodman Properties for repayment of half of the indebtedness.[69] They would, too, become personally liable to Goodman Properties in the event that it had to pay any more than the remaining half.[70] Thus, as a precondition to availing themselves of the option, the optionees —all three, we have held [71]—would pledge their credit, to the tune of half of

**62.** "In the relation of debtor and creditor there is more than simply the financial ability of the debtor and value of the security given. The character of the man is oftentimes worth more than his property as an assurance of prompt payment, and security of that which he holds upon which the lien exists. But it is useless to speculate upon reasons that might be assigned why a creditor might prefer one man to another as his debtor. It is his right to make his own contracts, with which courts cannot interfere except to enforce them as made." Menger v. Ward, *supra* note 58, 30 S.W. at 855.

**63.** The contact does not require continuing management of Gateway Apartments by the optionees after exercise of the option. It provides "that the 'prospective purchasers' are not licensed real estate brokers and" that "the management aspect involved in this agreement is in effect a trial period to permit them to attempt to improve the property and to determine adviseability [*sic*] to exercise the option to purchase a one-half (½) interest therein."

**64.** See note 27, *supra*.

**65.** Sims v. Cordele Ice Co., *supra* note 58, 46 S.E. at 843. Compare Koehler Hinrichs Mercantile Co. v. Illinois Glass Co., 143 Minn. 344, 173 N.W. 703, 704–705 (1919); Carluccio v. 607 Hudson Street Holding Co., 141 N.J.Eq. 449, 57 A.2d 452, 454 (1948); Cochran v. Taylor, 273 N.Y. 172, 7 N.E.2d 89, 92–93 (1937).

**66.** This problem, which we are about to discuss, was not treated in the parties' briefs, but was raised by us during oral argument.

The parties had the opportunity to address it during argument. They might also have filed post-argument memoranda by leave of court, which in such circumstances we grant freely. Compare Truck Drivers Local 413 v. NLRB, 159 U.S.App.D.C. 228, 241, 487 F.2d 1099, 1112 (1973).

**67.** See note 27, *supra*. The record indicates that the unpaid principal balance of the mortgage at the time of attempted exercise of the option was slightly above $1 million.

**68.** See note 27, *supra*.

**69.** Reid v. Whisenant, 161 Ga. 503, 131 S.E. 904, 906–908, 44 A.L.R. 599 (1926); Wright v. Wagner, 182 Md. 483, 34 A.2d 441, 445 (1943); Guardian Depositors Corp. v. Brown, 290 Mich. 433, 287 N.W. 798, 799–800 (1939); McLeod v. Building & Loan Ass'n, 168 Miss. 457, 151 So. 151, 152 (1933); Brown v. Turner, 202 N.C. 227, 162 S.E. 608, 609 (1932); Rendine v. Catoia, 52 R.I. 140, 158 A. 712, 713 (1932).

**70.** Teas v. Kimball, 257 F.2d 817, 825 (5th Cir. 1958); Evans v. Sperry, 12 F.2d 438, 439 (E.D.Ill.1926); Malone v. United States, 326 F.Supp. 106, 111 (N.D.Miss.1971), aff'd, 455 F.2d 502 (5th Cir. 1972); Duke v. Kilpatrick, 231 Ala. 51, 163 So. 640, 641 (1935); Rosenthal v. Heft, 155 Md. 410, 142 A. 598, 602 (1928); Cecil v. Dollar, 147 Tex. 541, 218 S.W.2d 448, 450 (1949). See also Brown v. Brown, 58 Ariz. 333, 119 P.2d 938, 939–940 (1941); Thorsen v. Poe, 123 Ark. 77, 184 S.W. 427, 428 (1916); In re Keil's Estate, 51 Del. 351, 145 A.2d 563, 565 (1958).

**71.** See Part II, *supra*.

the debt, primarily to further secure the mortgagee and secondarily to protect Goodman Properties against payment exceeding the other half.

 The question, then, becomes whether, in light of these considerations, a tender of performance of the option conditions by but two of the three optionees triggered the obligation of Goodman Properties to abide the option. Stated somewhat differently, the question is whether the performance tendered could legally comply with one of the terms upon which the option was conferred. We think the answer must clearly be in the negative. It was the personal credit of Hillman as well as the credit of the Claymans on the mortgage assumption that Goodman Properties agreed to, and which the contract entitled it to receive. When the Claymans sought to exercise the option alone, they could not give the performance for which their adversary had contracted. Goodman Properties has the right to stand on its contract. It cannot be compelled to accept what plainly is considerably less than what the contract requires.

We are advertent to the fact that most of the cases dealing with contractual extensions of financial credit have involved situations wherein one contracting party attempted to assign his right to purchase on credit to another who was not a party to the contract.[72] But the basic principle controlling decision of those cases has also been applied— properly, we think—where one party assigned his rights to another party on the debtor side of a contract extending credit.[73] We are unable to distinguish a case—the one here—in which one of three parties whose credit was bar-

gained for as a contract term declines to participate in its performance.[74] In each situation the contract demands the credit of particular contractors, and must be given its just due.

The Claymans have repeatedly emphasized that Hillman was young, relatively inexperienced, and unknown to Dr. Goodman prior to commencement of the negotiations leading to the contract. All of this seems to be true, but it is of no moment. When we are dealing with a contract, we are not at liberty to inquire as to why the contractors chose to contract the way they did. Here the parties cast their option agreement in terms exacting the joint performance of all three of the optionees. It is not our function to ferret out their reasons for doing so, or to rewrite their agreement when dissatisfaction develops. Our duty is to enforce the contract as made.

The judgment appealed from is

Affirmed.

On Appellants' Petition for Rehearing

### ORDER

On consideration of appellants' petition for rehearing, it is

Ordered by the Court that the aforesaid petition for rehearing is denied, in accordance with the opinion of this Court filed herein this date.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

The Claymans seek rehearing of our decision herein [1] and advance two arguments in support of their petition. The first is that a principle to which we adhered—that a promise by two or more persons presumptively creates a joint obligation [2]—is not apposite to this case.

---

72. See note 58, *supra*.

73. D. C. Hardy Implement Co. v. South Bend Iron Works, *supra* note 58, 31 S.W. at 599; Paige v. Faure, 229 N.Y. 114, 127 N.E. 898, 899 (1920).

74. We note, in addition to the principles discussed, that the contract expressly prohibited assignment by the purchasers without the written consent of Goodman Properties. It

seems obvious that even without a formal assignment of Hillman's interest to the Claymans, enforcement of the option without his performance of the option conditions would have precisely that effect.

1. Clayman v. Goodman Properties, Inc., 171 U.S.App.D.C. ——, 518 F.2d 1026 (1973).

2. See *id.* at note 26.

The second is that we were mistaken in our understanding that Goodman Properties was personally liable for payment of the mortgage indebtedness on Gateway Apartments.[3] These contentions lead to renewed insistence that Hillman's disaffiliation with the Gateway Apartments project did not legally affcct the Claymans' endeavor to exercise the option in suit. We disagree, and accordingly deny the petition for rehearing.

I

In our earlier opinion, we interpreted the agreement conferring the option in light of the well settled rule " 'that the obligation created by the promise of several persons is joint unless the contrary is made evident.' "[4] We concluded that the agreement conditioned exercise of the option upon an assumption by Hillman, as well as by the Claymans, of half of the outstanding mortgage debt on Gateway Apartments.[5] The petition for rehearing asserts that the canon guiding our construction of the agreement is limited in operation to those who are obligors, and has no application to those to whom a contract extends its benefits as obligees. The petition further claims that the Claymans and Hillman were strictly obligees of the option agreement —that the agreement demanded of them no performance whatever to ripen the right to exercise the option.

This argument ignores the express terms upon which the option was granted.[6] One term was the optionees' assumption of half of the balance owed on the mortgage.[7] The option agreement explicating that term was itself a provision of a bilateral contract between those who were the optioner and the optionees. To be sure, the option provisions, by their very nature, conferred upon the optionees a prerogative to which they were free to resort. But those provisions, in no uncertain terms, exacted from the optionees a compliance with the conditions stipulated in the event that an exercise of the option was attempted.

It was that obligation of compliance which our opinion held to be joint,[8] and to be unsatisfied by an assumption proffered by the Claymans without Hillman.[9] As our opinion stated,

> The contract requires the optionees, upon an exercise of the option, to assume one-half of a large mortgage indebtedness on the property. We carefully note that the requirement is an assumption of half of the outstanding balance, as distinguished from acceptance of a half interest in Gateway Apartments subject to the mortgage. Upon an assumption, the optionees would become personally liable along with Goodman Properties to the mortgage. Upon such an assumption, the optionees would become personally liable along with Goodman Properties for repayment of half of the indebtedness. They would, too, become personally liable to Goodman Properties in the event it had to pay any more than the remaining half. Thus, as a precondition to availing themselves of the option, the optionees—all three, we have held—would pledge their credit, to the tune of half of the debt, primarily to further secure the mortgagee and secondarily to protect Goodman Properties against payment exceeding the other half.[10]

3. See *id.* at note 69. As in our earlier opinion, we adopt the contracting parties' use of the word "mortgage" in their agreement as to the option, see *id.* at n. 27, referring in each instance to what seems actually to have been a deed of trust.

4. *Id.* at note 26, quoting Welch v. Sherwin, 112 U.S.App.D.C. 124, 126, 300 F.2d 716, 718 (1962), in turn quoting 2 Williston, Contracts § 323 (1936).

5. Clayman v. Goodman Properties, Inc., *supra* note 1, at notes 21–74.

6. *Id.* at n. 27.

7. *Id.*

8. *Id.* at notes 26–34.

9. *Id.* at notes 51–74.

10. *Id.* at notes 67–72.

## II

The Claymans' second complaint focuses on our statement that upon the assumption which the option agreement called for, "the optionees would become personally liable *along with* `Goodman Properties* for repayment of half of the indebtedness." [11] The petition for rehearing asserts that Goodman Properties took title to Gateway Apartments subject to the mortgage, without incurring any personal liability for payment of the debt it secured. On this ground, the petition argues that Goodman Properties, the optionor, did not need the personal responsibility of others for part of the indebtedness, and that an assumption by all three of the optionees was of little or no importance.[12]

The record on appeal, though sparse on the point, suggests that Goodman Properties was itself personally liable for payment of the mortgage. The contract of the sale of Gateway Apartments to Goodman Properties specified a price of $160,000 above the balance of approximately $1,098,034 then due on the mortgage.[13] The contract provided that Goodman Properties would take title subject to the mortgage, without expressly stating whether Goodman Properties would assume the responsibility for payment.[14] The contract also contained the sellers' covenant that the mortgage was self-liquidating, without any extraordinary curtailment requirement,[15] and the statement of the settlement of the sale discloses that the transaction was consummated on the basis foregoing.[16] An assumption of personal liability on a mortgage indebtedness may be either express or implied [17] and, it has been held, will be implied when the amount of the indebtedness is deducted from the agreed price under circumstances fairly contemplating assumption by the purchaser.[18] Unlike the Claymans, we cannot overlook the somewhat unique circumstances here.[19]

We need not pursue the matter further, however, for the status of Goodman Properties' responsibility to pay the mortgage does not in any way affect the outcome of this case. While our earlier opinion intimates a thought that Goodman Properties was personally liable, we did not intend an adjudication on that score, nor do we now. The critical consideration is that in any event the mortgage debt had to be paid or else Gateway Apartments would be lost through foreclosure, and Goodman Properties obviously had an interest in protecting itself against that. The option agreement conferred upon the three optionees the privilege of buying a half interest in Gateway Apartments, and the optionees' assumption of personal liability for half of the debt was an available means of maximizing Goodman Properties' security.

In these circumstances, it will not do to say merely that an assumption was unimportant, factually or legally, to Goodman Properties. It deemed the assumption condition important enough to write it into the option agreement and it is not for us to delete it. As we said in our earlier opinion,

11. See text *supra* at note 10 (emphasis supplied).

12. Alternatively, the Claymans argue that there was a jury question as to the materiality of Hillman's disaffiliation with the Gateway Apartments project and his refusal to join the Claymans in the exercise of the option.

13. Plaintiffs' Exhibit 14.

14. Plaintiffs' Exhibit 14.

15. Plaintiffs' Exhibit 14.

16. Plaintiffs' Exhibit 13.

17. See cases cited *infra* note 18.

18. *E. g.*, Banta v. Rosasco, 12 Cal.App.2d 420, 55 P.2d 601, 602 (1936) ; Warner v. Bookstahler, 48 Idaho 419, 282 P. 862, 863 (1929) ; Rosenthal v. Heft, 155 Md. 410, 142 A. 598, 602–03 (1928) ; Sanderson v. Turner, 73 Okl. 105, 174 P. 763, 764, 2 A. L.R. 347 (1918) ; Faulkner v. McHenry, 235 Pa. 298, 83 A. 827, 828, Ann.Cas.1913D, 1151 (1912).

19. Compare Dick v. Vogt, 196 Okl. 66, 162 P. 2d 325, 327, 329, 331 (1945). *Cf.* Hinckley Estate Co. v. Gurry, 53 Idaho 551, 26 P.2d 121, 123 (1933).

When we are dealing with a contract, we are not at liberty to inquire as to why the contractors chose to contract the way they did. Here the parties cast their option agreement in terms exacting the joint performance of all three of the optionees. It is not our function to ferret out their reasons for doing so, or to rewrite their agreement when dissatisfaction develops. Our duty is to enforce the contract as made.[20]

Petition denied.

Senior Circuit Judge FAHY did not participate in the foregoing opinion and the order disposing of the petition for rehearing.

---

**20.** Clayman v. Goodman Properties, Inc., *supra* note 1, at notes 73–74.